RECEIVED IN PRO SE
OCT 18, 2022 @ 2:08 PM
VIA BOX.COM

October 17, 2022

Honorable LaShann DeArcy Hall
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re: *Rosenshine v. A. Meshi Cosmetics Industries Ltd. et al, Case # 1:18-cv-03572-LDH-LB***

Dear Judge DeArcy Hall,

In accordance with this Court's order for Plaintiffs to respond to Defendant A. Meshi Cosmetics Industries Ltd.'s ("Meshi") request for a pre-motion conference, we hereby respond as follows:

## 1. First claim (federal trademark counterfeiting in violation of 15 U.S.C. § 1114)

Meshi's *Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F.Supp.2d 455, 471 (E.D.N.Y. 2008) case citation regarding relief under Section 32 of the Lanham Act refers to an instance where a party (in this case distributor Krasnyi Oktyabr) that does not own trademark rights has no standing to bring a claim under Section 32 of the Lanham Act. In our case, Plaintiffs are the undisputable trademark owners that hold the rights to the Star Gel® trademark so they have standing to bring a claim under Section 32 of the Lanham Act. Meshi's claim that it only sold 3,600 units of counterfeit Star Gel® on November 2016 before the trademark was registered in May 2017 does not relieve Meshi from liability under Section 32 of the Lanham Act as the counterfeiting was ongoing past the registration date, including in 2018. Not only that, Meshi never took any action to stop the counterfeiting operation after placing the counterfeit Star Gel® products in the stream of commerce in November 2016, even after cease and desist letters were sent or the trademark was registered, and is therefore liable for federal trademark counterfeiting under Section 32 of the Lanham Act. Meshi was already familiar with the Star Gel® trademark before the counterfeiting sale on November 2016, by virtue of being the supplier of Star Gel® to Plaintiffs' predecessors and the written agreement between them. In addition, Mr. Yermi Mizrahi refers to Plaintiffs' predecessor, Edna, in an email to Mr. Eyal Noach of A to Z Import Inc. ("AZ") from September 15, 2016 (before the November 2016 sale to AZ) mentioning Edna's use of the Star Gel® trademark, proving once again that he was aware of Plaintiffs' or their predecessor's rights to the Star Gel® trademark. As Meshi's counterfeit Star Gel® is identical to Plaintiffs' genuine Star Gel®, being the same type of product and sold to Plaintiffs' customers, it leaves no doubt that Meshi's sale of counterfeit Star Gel® is intentional, regardless of the trademark registration date. *Plaintiffs' Statement of Additional Facts ("Plaintiffs' Statement"), sections 1, 7, 10, 26, and 38; Plaintiffs' Response to Defendant A. Meshi Cosmetics Industries Ltd. Statement of Undisputed Material Facts ("Plaintiffs' Response"), sections 10, 34-39, and 41.*

## 2. Second claim (federal trademark infringement in violation of 15 U.S.C. § 1114, 1125(a) and New York State common law)

Meshi's claim that Plaintiffs admitted that they did not market or attempt to sell Star Gel® by 2016 is evidently false, as utilization of the Star Gel® mark never ceased. At any rate, Meshi's claim that Plaintiffs abandoned the Star Gel® trademark in November 2016 is refuted as Meshi itself acknowledges that Plaintiffs used the Star Gel® trademark in the three years prior to November 2016, referring to the invoices Plaintiffs produced. Meshi's sale of counterfeit Star Gel®, which is identical to Plaintiffs' Star Gel® trademark on identical goods (hair gel), to Plaintiffs' customer AZ, proves both potential and actual customer confusion, making Meshi liable under both 15 U.S.C. § 1114, 1125(a) and New York State common law. *Plaintiffs' Statement, sections 10 and 15-31; Plaintiffs' Response, sections 15, 20, 22, 24-26, 32, 49, and 51-54.*

### 3. Third claim (false designation of origin in violation of 15 U.S.C. § 1125(a))

Meshi's counterfeit Star Gel®, which is identical to Plaintiffs' genuine Star Gel®, is being used on identical goods (hair gel) and sold to Plaintiffs' customer AZ, proving both potential and actual customer confusion. Meshi's claim that Plaintiffs had no Star Gel® to sell since October 2015 is refuted as the evidence Meshi provides refers to sales, not inventory or attempts to sell/market. Plaintiffs had ample inventory to sell in 2015 and beyond, and their utilization of the Star Gel® mark never ceased. Hence, Meshi's sale of counterfeit Star Gel® diverted Star Gel® sales from Plaintiffs as well as additional complementary sales, representing the harm sustained by Plaintiffs. As Meshi itself admits to having sold 3,600 counterfeit Star Gel® units to Plaintiffs' customer AZ, it is evident that enormous harm was inflicted upon Plaintiffs by Meshi's diversion of sales. *Plaintiffs' Statement, sections 10 and 15-31; Plaintiffs' Response, sections 20, 22, 24-26, 32, and 51-54.*

### 4. Fourth claim (federal trademark dilution in violation of 15 U.S.C. § 1125(c) and N.Y. Gen. Bus. Law § 360-l)

Plaintiffs have proved that the Star Gel® trademark is famous as it has been widely sold across the U.S. since 2004, unlike SBBI's trademark in *Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, 14 CIV. 7170 CM, 2014 WL 5585339, *7 (S.D.N.Y. Oct. 30, 2014), where SBBI's customers were not even alleged to be nationwide. Accordingly, Plaintiffs met the necessary requirements for federal trademark dilution under 15 U.S.C. § 1125(c). As Meshi's counterfeit Star Gel® is circulating on the market and diverting sales from Plaintiffs, while Meshi has not taken any steps to correct or mitigate any damages resulting from its counterfeiting activities, the dilution claim under N.Y. Gen. Bus. Law § 360-l is not moot, and injunctive relief is required in order to enjoin Meshi from further counterfeiting and compel it to disseminate corrective advertisements in a form approved by the Court to acknowledge Meshi's violations of the law hereunder, and ameliorate the false and deceptive impressions produced by such violations. *Plaintiffs' Statement, sections 10, 15-31, 52, 55, 85, and 87-92; Plaintiffs' Response, sections 16, 18, 37-38, 41, and 52-56.*

### 5. Fifth claim (federal unfair competition and false advertising under 15 U.S.C. § 1125 (a) and New York common law)

Meshi's claim of selling 3,600 units of counterfeit Star Gel® to Plaintiffs' customer AZ (offering identical product in the same distribution channel) satisfies both the zone of interest test and demonstrates economic injury to Plaintiffs of diverted Star Gel® sales to Meshi as well as additional complementary lost sales as previously discussed. Accordingly, both the zone of interest and proximate cause tests have been satisfied to establish statutory standing under Section 43. *Plaintiffs' Statement, sections 10 and 15-31; Plaintiffs' Response, sections 51-56.*

### 6. Sixth claim (contributory trademark infringement)

Meshi's sale of counterfeit Star Gel® to AZ constitutes inducement as Meshi was familiar with Plaintiffs' Star Gel® trademark by the time it sold counterfeit Star Gel® to AZ. Furthermore, by virtue of Meshi's familiarity with Plaintiffs' Star Gel® trademark, Meshi knew that selling counterfeit Star Gel® to Plaintiffs' customer AZ amounts to trademark infringement. Mr. Yermi Mizrahi refers to Plaintiffs' predecessor in an email to Mr. Noach of AZ from September 15, 2016 (before the November 2016 sale to AZ) mentioning Edna's use of the Star Gel® trademark, proving once again that he was aware of Plaintiffs' rights to the Star Gel® trademark. *Plaintiffs' Statement, sections 6-10, 14, 20, and 37-38; Plaintiffs' Response, sections 27-30, 35, 37-38, and 41.*

### 7. Ninth claim (tortious conspiracy)

Meshi's sale of counterfeit Star Gel® to AZ demonstrates a tort by diverting Star Gel® sales from Plaintiffs. Meshi's email exchange with AZ regarding selling counterfeit Star Gel® demonstrates an agreement between Meshi and AZ to sell counterfeit Star Gel® (Meshi refers to Plaintiffs' trademark

rights in the email exchange with AZ), and the subsequent sale demonstrates an overt act in furtherance of the agreement (Meshi's actual sale of Plaintiffs' Star Gel® to AZ) and the parties' intentional participation in executing the counterfeiting operation. Furthermore, Meshi's admission of selling 3,600 units of counterfeit Star Gel® to Plaintiffs' customer AZ demonstrates harm to Plaintiffs of diverted Star Gel® sales as well as additional complementary sales. *Plaintiffs' Statement, sections 6-10, 14, 20, and 15-31; Plaintiffs' Response, sections 51-56.*

### 8. Tenth claim (breach of contract)

Meshi's claim regarding Plaintiffs' and/or their predecessors' alleged unpaid balance of $1,967.64 for Star Gel® purchased in 2012 does not constitute a breach of contract by Plaintiffs and/or their predecessors, as the contract only refers to a single payment in the sum of $4,900 from 2004 (section 1 to the contract), while Meshi's claim of an alleged unpaid balance refers to a purchase from 2012, which is not part of the contract. Thus, Plaintiffs and their predecessors performed all their parts to the contract with Meshi, satisfying the condition of due performance by Plaintiffs necessary for their breach of contract claim against Meshi. Furthermore, Meshi's admission of selling 3,600 units of counterfeit Star Gel® to Plaintiffs' customer AZ demonstrates the harm done to Plaintiffs, consisting of diverted Star Gel® sales from Plaintiffs to Meshi as well as additional lost complementary sales, proving damages were sustained by Plaintiffs as a direct result of Meshi's breach. *Plaintiffs' Statement, sections 15-33; Plaintiffs' Response, sections 9, 12, and 23.*

\* \* \*

For all the reasons set forth above, Meshi's motion for summary judgment lacks any basis and the request for pre-motion conference should be denied.

Respectfully submitted,

                                        /s/ *Oren Rosenshine*    /s/ *Amir Rosenshine*
                                        Oren Rosenshine       Amir Rosenshine

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Oren Rosenshine<br>    20 Hawthorne Lane<br>    Great Neck, NY 11023<br>Amir Rosenshine<br>    20 Hawthorne Lane<br>    Great Neck, NY 11023<br><br>Plaintiffs,<br><br>  -against-<br><br>1) A. Meshi Cosmetics Industries Ltd.<br>    8 Shimon Habursakai Street<br>    Industrial Park Bat Yam 59598<br>    Israel<br>2) A to Z Import Inc.<br>    305 E 88th Street<br>    Brooklyn, NY 11236<br>3) Eyal Noach<br>    2445 E 65th Street<br>    Brooklyn, NY 11234<br><br>Defendants. | Case No.<br><br>18CV3572(LDH)(LB) |

PLAINTIFFS' RESPONSE TO DEFENDANT A. MESHI COSMETICS INDUSTRIES LTD.'S
STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs Oren Rosenshine and Amir Rosenshine respectfully submit the following opposition to A. Meshi Cosmetics Industries Ltd.'s ("Meshi") opening 56.1 statement of undisputed material facts:

1. Meshi is an Israeli company (registration number 511947020) with its headquarters and principal place of business in Bat Yam, Israel. See the June 3, 2019 Declaration of Yermi Mizrahi submitted in support of Meshi's Motion to Dismiss, (ECF No. 47-2) ("Mizrahi Decl."), ¶¶ 7-8, attached as Exhibit ("Ex.") 1 to the August 30, 2022 Declaration of Allison Khaskelis ("Khaskelis Decl.").

Response: Undisputed.

2. Its primary business is the manufacturing of skin and hair care products under the "Mon Platin" label. Id. at ¶ 9.

Response: Undisputed.

3. Meshi is solely a manufacturer. Meshi maintains no offices, employees, or any operations whatsoever in the United States. All of its products are sold on an "ex-work" basis, which means that Meshi manufactures all products in its factory in Israel and notifies purchasers when the order is complete. The purchasers arrange to pick up their orders from the Israeli factory and have complete control over onward shipping and resale of the products from that point forward. *Id.* at ¶¶ 10, 14, 19-20.

Response: Undisputed.

4. Meshi has relationships with various independent distributors around the world, who manage all aspects of onward sales of Meshi's products. Meshi works with numerous distributors for its various products, each of whom is wholly independent from Meshi. *Id.* at ¶¶ 11, 20.

Response: Undisputed.

5. Meshi was founded by the Mizrahi family in 1994 and remains a family business to this day, with Yermi Mizrahi ("Mr. Mizrahi") having taken over as president and CEO in 2014 upon the death of his brother Erez. Id. at ¶ 6; Khaskelis Decl. Ex. 2.

Response: Undisputed.

6. Global Manufacturing Import Export Inc. ("GMIE") was a company specializing in importing foreign, including Israeli, cosmetics products into the United States for sales to distributors and retail consumers. Amended Complaint ("Am. Compl.") (ECF No. 32) 6. It has been inactive since January 2015. Khaskelis Decl. Ex. 3. It has been previously run by the Plaintiffs' mother, Edna Rosenshine ("Edna"). See Exs. 2, 3 and 4 to Am. Compl.

Response: Undisputed.

7. Pursuant to an assignment agreement dated July 31, 2014, Edna, on behalf of GMIE, transferred the rights to the Star Gel mark to International Grooming, Inc. ("International Grooming"). Am. Compl. Ex. 4. The Plaintiffs, along with their sister Dorin Rosenshine, acted as the co-CEOs of International Grooming. Id. On January 31, 2018, International Grooming assigned the rights to the Star Gel mark to the Plaintiffs' father, Elazar Rosenshine ("Elazar"). Am. Compl. Ex. 7. On January 1, 2019, Elazar assigned the rights to the Star Gel mark to the Plaintiffs. Am. Compl. Ex. 8.

Response: Undisputed.

8. The present dispute arises from the 2004 agreement between GMIE and Meshi. Am. Compl. ¶ 4.

Response: Disputed. The present dispute arises not only from the 2004 agreement, but also from all claims alleged in the Amended Complaint ("Am. Compl.").

9. Pursuant to the terms of that agreement, Meshi agreed to manufacture 2,000 units of a jojoba hair gel for GMIE at the price of $2.45 per unit, for a total payment of $4,900. Am. Compl. Exs. 2 & 3, ¶ 1. GMIE sent a label to Meshi to print and affix on the manufactured units. Id. at ¶¶ 3-4, 7. GMIE called the product "Star Gel" and designed a logo for it. Id. Meshi agreed to make the product available on an ex-work basis by October 31, 2004. Id. at ¶ 5; Khaskelis Decl. Ex. 1 ¶ 26.

Response: Undisputed.

10. While the contract was not renewed in writing after 2004, the relationship between Meshi and GMIE continued until 2012 on the basis of verbal orders. Khaskelis Decl. Ex. 1 ¶ 30. Between 2004 and 2012, Meshi supplied approximately $10,000 worth of Star Gel to GMIE on an annual basis. Id.

Response: First sentence is disputed. As the contract granted GMIE an exclusive right to the Star Gel® trademark with no time limit, there was no need to renew the contract. Am. Compl. Exs. 2 & 3, ¶ 7. Second sentence is undisputed.

11. Neither the Plaintiffs nor its predecessors in interest ordered any Star Gel from Meshi after 2012. Id. at ¶ 31.

Response: Undisputed.

12. The Plaintiffs and/or their predecessors in interest failed to remit a final payment owed to Meshi in the amount of US $1,967.64 for their 2012 Star Gel orders. Khaskelis Decl. Ex. 4.

Response: Disputed. Khaskelis Decl. Ex. 4 shows an opening balance of $1,963.12 from the date of 01/01/2012, which proves that the source of this alleged open balance was not Plaintiffs' and/or their predecessors' 2012 Star Gel® orders. In fact, the opening balance originates from the failure of Meshi to credit GMIE's account for defective Star Gel® units that GMIE received from Meshi prior to 2012. See sections 25-26 of Exhibit ("Ex.") 1 to the October 17, 2022 Declaration of Oren Rosenshine ("Rosenshine Decl.").

13. On March 24, 2022, Meshi served the Plaintiffs with formal requests for the production of documents ("Document Requests") (ECF No. 82-1). Khaskelis Decl. Ex. 5. While the requests speak for themselves, they sought to establish the record of all sales of Star Gel that the Plaintiffs or their predecessors in interest undertook or attempted to undertake between 2012 and the date of the requests, as well as the losses that the Plaintiffs suffered as a result of Meshi's alleged infractions. Id.

Response: Undisputed.

14. Meshi's attorneys repeatedly chased the Plaintiffs for responses to their Document Requests after the deadline for the same has passed. See, e.g., Khaskelis Decl. Ex. 6 (ECF No. 82-2), pp. 3, 5, 10.

Response: Disputed. Plaintiffs requested more time to complete their responses, as the discovery requests were extremely wide-ranging. Khaskelis Decl. Ex. 6, pp. 4, 5, 6.

15. On May 31, 2022, the Plaintiffs finally produced a set of invoices (without Bates numbers) demonstrating sales of Star Gel to grocery stores and other distributors from January 2013 until October 19, 2015. Khaskelis Decl. Ex. 7. The Plaintiffs provided no paragraph by paragraph responses to the Document Requests. The Plaintiffs' covering email producing the above-referenced invoices stated that "[i]n response to your document requests, we do not have any documents to produce at this time except for the attached Star Gel® invoices that we were able to locate so far." Id.

4

Response: Undisputed.


16. While many of the invoices demonstrate sales in New York, a number of the invoices demonstrate sales outside of this jurisdiction, including in Florida, California, Pennsylvania, Maryland and New Jersey. Id. All sales were to grocery stores and distributors serving a primarily Jewish and/or Israeli clientele. Id.

Response: Disputed. The invoices include sales to retailers not catering primarily to Jewish and/or Israeli clientele, including one large supermarket chain store that serves general clientele. Khaskelis Decl. Ex. 7.


17. GMIE and/or its successors in interest sold its remaining inventory of the Star Gel that it purchased from Meshi in or before 2012 by October 19, 2015. Id.

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. The October 19, 2015 date cited by Meshi refers to the date of the last Star Gel® invoice produced by Plaintiffs, not to Plaintiffs' or their predecessors' Star Gel® inventory level at that date. In fact, International Grooming, Inc. ("IG") had more than 1,008 units of Star Gel® in its inventory on October 19, 2015. Rosenshine Decl. Ex. 1, sections 17, 20, and 21.


18. The Plaintiffs and/or their predecessors in interest sold a total of 2,131 units of Star Gel in and outside of New York between January 1, 2013 and October 19, 2015. Id. Pursuant to these invoices, the maximum sale price that the Plaintiffs and/or their predecessors in interest received for a single unit of Star Gel was $10. Id. Between January 1, 2013 and October 19, 2015, Plaintiffs earned a total revenue of $19,812 for distributing Star Gel. Id.

Response: Disputed. Meshi only cites the invoices produced by Plaintiffs, even though there were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Khaskelis Decl. Ex. 7, p. 1; Rosenshine Decl. Ex. 1, sections 20-21. Furthermore, Meshi only accounts for sales of the Star Gel® products in calculating the total revenue earned by Plaintiffs for distributing Star Gel®, ignoring sales of complementary products generated by and/or dependent upon sales of Star Gel®, which the invoices demonstrate amount to many times more than $19,812. Khaskelis Decl. Ex. 7; Rosenshine Decl. Ex. 1, sections 8-13, 16, and 22.


19. Assuming that the Plaintiffs and/or their predecessors in interest purchased Star Gel from Meshi for $2.45 per unit (see Exhibits 2 and 3 to Am. Compl.), it follows that, as a best-case scenario, the Plaintiffs and/or their predecessors in interest earned a profit of $14,591.05 in the nearly 3 years of selling leftover Star Gel between January 2013 and October 2015. Id. This figure does not deduct the amounts of Star Gel sold outside of New

York, does not factor in the costs of importing the Star Gel shipments from Israel to the United States and does not take into account any discounts offered to any of the customers, though some invoices indicate certain discounts. Id.

Response: Disputed. Meshi only cites the invoices produced by Plaintiffs, even though there were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Khaskelis Decl. Ex. 7, p. 1; Rosenshine Decl. Ex. 1, sections 20-21. Furthermore, Meshi only accounts for sales of the Star Gel® products in calculating the total revenue earned by Plaintiffs for distributing Star Gel®, ignoring sales of complementary products generated by and/or dependent upon sales of Star Gel®, which the invoices demonstrate amount to many times more than $19,812. Khaskelis Decl. Ex. 7; Rosenshine Decl. Ex. 1, sections 8-13, 16, and 22.

20. The Plaintiffs had no Star Gel to sell after 2015. Khaskelis Decl. Ex. 8, p. 19, lines 1-2 ("after 2015 there is no Star Gel. So you can say from 2013 to today.")

Response: Disputed. This statement of fact is not supported by direct evidence. Instead, it is Meshi's distorted interpretation of the quoted phrase. In fact, the phrase cited by Meshi refers to Star Gel sales invoices that Plaintiffs were able to locate by that time (at that time, none were located post 2015). The phrase did not in any way refer to Plaintiffs' Star Gel® inventory. Indeed, Plaintiffs' predecessor, IG, had more than 1,008 units of available stock for sale after 2015. Rosenshine Decl. Ex. 1, sections 17, 20, and 21.

21. The Plaintiffs have no additional documents responsive to the Document Requests. See the following exchanges:

THE COURT: So you don't have to answer the instructions which go on for ten pages, but they tell you what you're supposed to give them. And then they start asking you the actual questions. And the documents to be produced are 1 through 20. Do you see those requests?

MR. O. ROSENSHINE: Yes.

THE COURT: Have you produced all of those documents?

MR. O. ROSENSHINE: Yes. We went through everything. We didn't skip anything. We read through the entire...

Id. at p.18, lines 5-15.

THE COURT: Mr. Rosenshine, have you turned over any email regarding your interest in Star Gel or in [sic] communications between you and your predecessors or any third parties? Have you turned over any email, sir?

MR. A. ROSENSHINE: We recited we do not have any. So as we said, we do not have any other documents whatever they requested.

Id. at p. 26, lines 8-14.

THE COURT: You've stated on the record that you've given them everything you have. You have nothing else. Which means that you will not be able to produce something and surprise them. Do you understand that, Mr. Oren Rosenshine?

MR. O. ROSENSHINE: Yes. I just want to clarify --

THE COURT: Do you understand that, Mr. --excuse me. Do you understand that, Mr. Amir Rosenshine?

MR. A. ROSENSHINE: Yes.

Id. at p. 31, lines 9-18.

Response: Disputed. Plaintiffs have no additional documents responsive to the Documents Requests because they could not locate any additional documents before the end of discovery, not because such documents never existed. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015. Plaintiffs could not locate the invoices for those sales before the end of discovery. Rosenshine Decl. Ex. 1, sections 20-21.


22. The Plaintiffs took no steps to obtain any additional supplies of Star Gel hair gel after 2012. See, e.g., Khaskelis Decl. Ex. 5 ¶¶ 3, 5, 6, 7, 182; Khaskelis Decl. Ex. 7.

Response: Disputed. Plaintiffs had plenty of Star Gel inventory after 2012, so no additional supplies were needed to be obtained, as demonstrated by the Star Gel® sales documented by invoices Plaintiffs produced. Khaskelis Decl. Ex. 7.


23. The Plaintiffs did not pay off their outstanding arrears to Meshi in the amount of $1,967.64 for Star Gel purchased in 2012. Khaskelis Decl. Ex. 5 ¶ 16; Khaskelis Decl. Ex. 7.

Response: Disputed. Khaskelis Decl. Ex. 4 shows an opening balance of $1,963.12 from the date of 01/01/2012, which proves that the source of this alleged open balance was not Plaintiffs' and/or their predecessors' 2012 Star Gel® orders. In fact, the opening balance originates from the failure of Meshi to credit GMIE's account for defective Star Gel® units that GMIE received from Meshi prior to 2012. Rosenshine Decl. Ex. 1, sections 25-26.


24. The Plaintiffs did not market, attempt to sell or sell Star Gel from October 2015 until March 2022. Khaskelis Decl. Ex. 5 ¶¶ 1, 2, 3, 4, 5, 18; Khaskelis Decl. Ex. 7.

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. The evidence cited by Meshi only shows the invoices produced by Plaintiffs, even though there

were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Furthermore, the evidence Meshi cites only shows actual Star Gel® sales, so it cannot establish a lack of attempts to market or sell Star Gel®. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015. Furthermore, attempts to sell Star Gel® never ceased and continue by IG to this day. Rosenshine Decl. Ex. 1, sections 13-21.

25. The Plaintiffs did not utilize the Star Gel mark in any manner between October 2015 and May 2017. Khaskelis Decl. Ex. 5 ¶ 18; Khaskelis Decl. Ex. 7.

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. The evidence cited by Meshi only shows the invoices produced by Plaintiffs, even though there were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Furthermore, the evidence Meshi cites only shows actual Star Gel® sales, so it cannot establish a lack of attempts to market or sell Star Gel®, or a lack of utilization of the Star Gel® trademark by Plaintiffs or their predecessors. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015. Furthermore, attempts to sell Star Gel® never ceased and continue by IG to this day, which constitute an uninterrupted utilization of the Star Gel® mark. Rosenshine Decl. Ex. 1, sections 13-21.

26. Neither the Plaintiffs nor their predecessors in interest sourced or attempted to market or sell any Star Gel since October 19, 2015. See ¶¶ 17, 20-25, above.

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. There were additional Star Gel® sales beyond those demonstrated by the invoices produced by Plaintiffs, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Furthermore, the invoices Plaintiffs produced only show actual Star Gel® sales, so they cannot establish a lack of attempts to market, sell, or source Star Gel®. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015. Furthermore, attempts to sell Star Gel® never ceased and continue by IG to this day, which constitute an uninterrupted utilization of the Star Gel® mark. IG had no need to source Star Gel® as it had more than 1,008 units of available stock for sale after 2015. Rampant counterfeiting by Meshi, A to Z Import Inc. ("AZ"), and Mr. Eyal Noach ("Mr. Noach") (collectively, "Defendants") continues to this day, precluding any genuine Star Gel® sales, never mind the need to source additional stock. Rosenshine Decl. Ex. 1, sections 13-21.

27. Meshi did not sell any Star Gel following 2012 and until it was approached by Eyal Noach ("Mr. Noach") of A to Z Imports Inc. ("A to Z") in the fall of 2016. Khaskelis Decl. Ex. 1 ¶¶ 33, 35.

Response: Disputed. Meshi approached Mr. Noach before the fall of 2016. Toward the end of 2015, Mr. Noach told IG that he "finally found the manufacturer of Star Gel®" and that AZ "will now be buying Star Gel® directly from the manufacturer" at a much lower price than IG's pricing. AZ then proceeded to solicit orders for Star Gel® and complementary products from numerous of IG's customers, offering them a lower price point for Star Gel® and diverting both Star Gel® sales and sales of complementary products from IG. On September 15, 2016, Mr. Yermi Mizrahi ("Mr. Mizrahi") wrote to Mr. Noach as follows: "It was nice talking to you over the phone and I hope we can do business together". This further proves that there was contact between Mr. Mizrahi and Mr. Noach prior to the fall of 2016. All of the above proves that Meshi has been actively deceiving IG's numerous U.S. customers, including AZ and Mr. Noach, by approaching them, offering them, and selling them counterfeit Star Gel® merchandise. Rosenshine Decl. Ex. 1, sections 13, 36, 38, 96, and 99; Rosenshine Decl. Ex. 2, page 1.

28. Mr. Noach was looking for the manufacturer of Star Gel and seeking to place an order. Id. at ¶ 35.

Response: Disputed. It was Meshi who was looking to sell counterfeit Star Gel® to Plaintiffs' customer AZ. Toward the end of 2015, Mr. Noach told IG that he "finally found the manufacturer of Star Gel®" and that AZ "will now be buying Star Gel® directly from the manufacturer" at a much lower price than IG's pricing. AZ then proceeded to solicit orders for Star Gel® and complementary products from numerous of IG's customers, offering them a lower price point for Star Gel® and diverting both Star Gel® sales and sales of complementary products from IG. On September 15, 2016, Mr. Mizrahi wrote to Mr. Noach as follows: "It was nice talking to you over the phone and I hope we can do business together". All of the above proves that Meshi has been actively deceiving IG's numerous U.S. customers, including AZ and Mr. Noach, by approaching them, offering them, and selling them counterfeit Star Gel® merchandise. Rosenshine Decl. Ex. 1, sections 13, 36, 38, 96, and 99; Rosenshine Decl. Ex. 2, page 1.

29. It was Mr. Noach who initiated the contact with Meshi's Mr. Mizrahi. Id.

Response: Disputed. It was Meshi who initiated the contact with AZ. Rosenshine Decl. Ex. 1, sections 13, 36, 38, 96, and 99; Rosenshine Decl. Ex. 2.

30. Before that call, Meshi had no distributorship arrangement or any relationship whatsoever with A to Z. Id. at ¶ 34. Meshi has had no relationship with A to Z since that one-time sale. Id.

Response: Disputed. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016, including in 2018, demonstrating a continuing business relationship with AZ. Khaskelis Decl. Ex. 1, section 30; Rosenshine Decl. Ex. 1, sections 13-19 and 24; Rosenshine Decl. Ex. 2, pages 15-17.


31. At that point, Meshi has had no commercial dealings with GMIE or its successors in interest for approximately four years. Id. at ¶ 31.

Response: Disputed. At that point, the agreement between Meshi and GMIE or its successors was still in force, as the agreement grants GMIE exclusivity on the Star Gel® mark with no time limit. Am. Compl. Exs. 2 & 3, ¶ 7.


32. At that point, approximately a year passed since GMIE or its successors in interest took any steps to source, advertise or sell Star Gel. Khaskelis Decl. Ex. 7.

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. The evidence cited by Meshi only shows the invoices produced by Plaintiffs, even though there were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Furthermore, the evidence Meshi cites only shows actual Star Gel® sales, so it cannot establish a lack of attempts to market, sell, or source Star Gel®. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015. Furthermore, attempts to sell Star Gel® never ceased and continue by IG to this day, which constitute an uninterrupted utilization of the Star Gel® mark. IG had no need to source Star Gel® as it had more than 1,008 units of available stock for sale after 2015. Rampant counterfeiting by Defendants continues to this day, precluding any genuine Star Gel® sales, never mind the need to source additional stock. Rosenshine Decl. Ex. 1, sections 13-21.

10

33. A to Z was a client of GMIE and/or its successors in interest. A to Z purchased 240 units of Star Gel of the 2,131 total units sold by the Plaintiffs' predecessors in interest between January 2013 and October 2015, which amounted to 11% of its total sales. Id. (calculated from invoices supplied).

Response: Disputed. The evidence cited by Meshi only shows the invoices produced by Plaintiffs, even though there were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015. Once AZ received counterfeit Star Gel® merchandise from Meshi, it was able to undercut IG on price, divert sales from IG's customers to itself, and drive the genuine Star Gel® products out of the market. Rosenshine Decl. Ex. 1, sections 13-21.

34. Meshi made a one-time sale of Star Gel to A to Z in November 2016 in the amount of 3,600 units, for a price of $3/unit. The total value of that sale was $10,800. Khaskelis Decl. Ex. 1 ¶ 36; Khaskelis Decl. Ex. 9.

Response: Disputed. Meshi's counterfeiting was ongoing past November 2016, as demonstrated by online listings of Meshi's counterfeit Star Gel® products. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016, including in 2018, demonstrating a continuing business relationship with AZ. Khaskelis Decl. Ex. 1, section 30; Khaskelis Decl. Ex. 10, pages 22-31; Rosenshine Decl. Ex. 1, sections 13-19 and 24; Rosenshine Decl. Ex. 2, pages 15-17.

35. A to Z supplied the artwork for the label for the product, which listed A to Z's address. Khaskelis Decl. Ex. 1 ¶ 43 & Exhibit 5 to Am. Compl. Meshi was not involved in the creation or choice of the label. Khaskelis Decl. Ex. 1 ¶ 43.

Response: Disputed. Meshi supplied Plaintiffs' Star Gel® artwork for producing the label of the counterfeit Star Gel® products to AZ. Mr. Mizrahi wrote to Mr. Noach, "... attached is one of the versions". Rosenshine Decl. Ex. 2, pages 1 and 17.

36. Meshi has only ever sold any Star Gel to GMIE and A to Z. Id. at ¶ 21.

Response: Disputed. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Khaskelis Decl. Ex. 1, section 30; Rosenshine Decl. Ex. 1, sections 13-19 and 24.

37. Meshi has not sold any Star Gel to anyone in the United States following the one-time sale to A to Z in November 2016. Id. at ¶¶ 21, 22, 50.

Response: Disputed. Meshi's counterfeiting was ongoing past November 2016, as demonstrated by online listings of Meshi's counterfeit Star Gel® products. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016, including in 2018, demonstrating a continuing business relationship with AZ. Khaskelis Decl. Ex. 1, section 30; Khaskelis Decl. Ex. 10, pages 22-31; Rosenshine Decl. Ex. 1, sections 13-19 and 24; Rosenshine Decl. Ex. 2, pages 15-17.

38. Meshi has taken no steps to advertise, promote or otherwise attempt to sell any Star Gel anywhere in the United States following the one-time sale to A to Z in November 2016. Id. at ¶¶ 23-24.

Response: Disputed. Meshi's counterfeiting was ongoing past November 2016, as demonstrated by online listings of Meshi's counterfeit Star Gel® products. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016, including in 2018, demonstrating a continuing business relationship with AZ. Khaskelis Decl. Ex. 1, section 30; Khaskelis Decl. Ex. 10, pages 22-31; Rosenshine Decl. Ex. 1, sections 13-19 and 24; Rosenshine Decl. Ex. 2, pages 15-17.

39. On May 9, 2017, the Plaintiffs' predecessors in interests applied to the United States Patent and Trademark Office to register the Star Gel mark for the first time. The United States Patent and Trademark Office registered the Star Gel trademark on December 19, 2017. Am. Compl. Ex. 6.

Response: Undisputed.

40. The Plaintiffs allege that they sent a cease and desist letter to Meshi on June 20, 2017. Am. Compl. ¶ 12. The Plaintiffs and/or their predecessors in interest sent no other correspondence to Meshi with regard to the A to Z sale prior to that date. Khaskelis Decl. Ex. 5 ¶ 15; Khaskelis Decl. Ex. 7.

Response: Undisputed.

41. Meshi has not engaged in any conduct outlined in the Amended Complaint since November 2016. Khaskelis Decl. Ex. 5 ¶ 17; Khaskelis Decl. Ex. 7.

Response: Disputed. Meshi's counterfeiting was ongoing past November 2016, as demonstrated by online listings of Meshi's counterfeit Star Gel® products. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that

persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016, including in 2018, demonstrating a continuing business relationship with AZ. Khaskelis Decl. Ex. 1, section 30; Khaskelis Decl. Ex. 10, pages 22-31; Rosenshine Decl. Ex. 1, sections 13-19 and 24; Rosenshine Decl. Ex. 2, pages 15-17.

42. Since applying to register the Star Gel mark with the United States Patent and Trademark Office, the Plaintiffs have neither sourced, marketed, attempted to sell or sold any Star Gel. Khaskelis Decl. Ex 5 ¶¶ 1, 2, 3, 4, 5, 6, 7, 18; Khaskelis Decl. Ex. 7.

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. The evidence cited by Meshi only shows the invoices produced by Plaintiffs, even though there were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Furthermore, the evidence Meshi cites only shows actual Star Gel® sales, so it cannot establish a lack of attempts to market, sell, or source Star Gel®. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015, including after 2017. Furthermore, attempts to sell Star Gel® never ceased and continue by IG to this day, which constitute an uninterrupted utilization of the Star Gel® mark. IG had no need to source Star Gel® as it had more than 1,008 units of available stock for sale after 2015. Rampant counterfeiting by Defendants continues to this day, precluding any genuine Star Gel® sales, never mind the need to source additional stock. Rosenshine Decl. Ex. 1, sections 13-21.

43. On December 14, 2020, the Plaintiffs served on Meshi's attorneys what they termed to be their disclosures. Khaskelis Decl. Ex. 10 (ECF No. 82-3), p. 2.

Response: Undisputed.

44. In these disclosures, the Plaintiffs provided the Declarations of Oren and Amir Rosenshine. Id. at pp. 6-15. Both declarations are dated December 10, 2020, are materially identical to one another and contain statements confirming that their contents are true and correct to the best of each Plaintiff's knowledge, information and belief under the penalty of perjury. Id. at pp.10, 15.

Response: Undisputed.

45. Each of these declarations asserts the Plaintiffs' entitlement for lost profits in the amount of $8,567,848, which, once trebled, entitle the Plaintiffs to the recovery of $25,703,544 in damages. Id. at pp. 9, 14.

Response: Disputed. The amounts cited by Meshi refer only to "lost profits resulting from said counterfeiting, including compensatory damages for lost profits on sales of Star Gel®, consequential damages for lost profits on sales of complementary products, and damages to goodwill and reputation". Other types of damages are detailed in the declarations. Khaskelis Decl. Ex. 10, pages 9-10 and 14-15.

46. Alongside these declarations, on December 14, 2020 the Plaintiffs supplied a one-page table, entitled "Computation of Lost Profits and Damages to Goodwill and Reputation" purporting to calculate these figures from 2015 until 2020 and beyond through a variety of compounding assumptions. Id. at p. 16. The Plaintiffs provided no basis for the calculations provided or the reasoning for their compounding assumptions.

Response: Disputed. Plaintiffs provided the basis for the calculations and outlined all assumptions. Khaskelis Decl. Ex. 10, page 16; Rosenshine Decl. Ex. 1, sections 22-23.

47. The damages figures that the Plaintiffs provided in the above-referenced are not limited to losses from the alleged Star Gel counterfeiting:

MR. A. ROSENSHINE: We did not show from 2015. We showed them from 2013 to 2015 just to start this. But these gross profits represent the entire gross profits of the company not just from the Star Gel because we are claiming that the Star Gel allows our company to sell to

THE COURT: But Mr. Rosenshine, this case is just about Star Gel, correct?

MR. A. ROSENSHINE: Yes. The damages that Star Gel counterfeiting caused us.

So it includes also complementary --

THE COURT: So you're saying that this chart, even though the chart would not prove anything, is not just related to Star Gel?

MR. A. ROSENSHINE: It is because what we are claiming is that all the complementary products that we sell to our customers by Star Gel has been also lost to A. Meshi because we couldn't --

THE COURT: Again sir, I only deal with the case that was filed in court. I don't deal with other concerns or issues that you have that are not part of this case.

MR. A. ROSENSHINE: Yes. So our calculation of damages in the complaint also explains that we are not only claiming damages for losses of Star Gel but also complementary products that --

THE COURT: Again, Mr. Rosenshine, your case here is about Star Gel.

Khaskelis Decl. Ex. 8, p. 15, line 20-p.16, line 22.

Response: Disputed. Meshi's counterfeiting of Star Gel® resulted in losses to Plaintiffs that consist of lost sales of Star Gel® products and lost sales of complementary products, among other losses. Meshi's counterfeiting caused both a diversion of sales of Star Gel® products and a diversion of sales of complementary products from Plaintiffs or their predecessors to others, including Meshi and AZ. Rosenshine Decl. Ex. 1, sections 8-19 and 22.

48. As demonstrated above, the Plaintiffs have neither sourced, sold, or attempted to sell any Star Gel since October 2015. They were not marketing or attempting to sell any Star Gel to anyone in the fall of 2016, when Meshi made a one-time sale of 3,600 units of Star Gel to A to Z. Khaskelis Decl. Ex. 5 ¶¶ 1, 2, 3, 4, 5, 6, 7, 18; Khaskelis Decl. Ex. 7.

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. The evidence cited by Meshi only shows the invoices produced by Plaintiffs, even though there were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Furthermore, the evidence Meshi cites only shows actual Star Gel® sales, so it cannot establish a lack of attempts to market, sell, or source Star Gel®. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015. Furthermore, attempts to sell Star Gel® never ceased and continue by IG to this day, which constitute an uninterrupted utilization of the Star Gel® mark. IG had no need to source Star Gel® as it had more than 1,008 units of available stock for sale after 2015. Rampant counterfeiting by Defendants continues to this day, precluding any genuine Star Gel® sales, never mind the need to source additional stock. Rosenshine Decl. Ex. 1, sections 13-21.

49. As such, Meshi's one-time sale could not have caused any harm to the Plaintiffs' Star Gel sales, which were already non-existent. *Id.*

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. The invoices produced by Plaintiffs demonstrate that Plaintiffs' predecessors had plenty of Star Gel® sales within the three years prior to Meshi's 2016 sale of counterfeit Star Gel®, leading to the unavoidable conclusion that Meshi diverted Star Gel® sales and sales of complementary products from Plaintiffs or their predecessors to itself and AZ. There were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery. Furthermore, the invoices only show actual Star Gel® sales, so they cannot establish a lack of attempts to market, sell, or source Star Gel®.

Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015. Furthermore, attempts to sell Star Gel® never ceased and continue by IG to this day, which constitute an uninterrupted utilization of the Star Gel® mark. IG had no need to source Star Gel® as it had more than 1,008 units of available stock for sale after 2015. Rampant counterfeiting by Defendants continues to this day, precluding any genuine Star Gel® sales, never mind the need to source additional stock. Khaskelis Decl. Ex. 7; Rosenshine Decl. Ex. 1, sections 13-21.

50. Consequently, the Plaintiffs' damages claims arise out of the harm that Meshi's one-time sale of Star Gel to A to Z allegedly caused to the sales of other, unspecified products in the Plaintiffs' sales catalogue. *Id.*

Response: Disputed. Meshi's counterfeiting of Star Gel® resulted in losses to Plaintiffs that consist of lost sales of Star Gel® products and lost sales of complementary products, among other losses. Meshi's counterfeiting caused both a diversion of sales of Star Gel® products and a diversion of sales of complementary products from Plaintiffs or their predecessors to others, including Meshi and AZ. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016, including in 2018, demonstrating a continuing business relationship with AZ. Khaskelis Decl. Ex. 1, section 30; Rosenshine Decl. Ex. 1, sections 8-19, 22, and 24; Rosenshine Decl. Ex. 2, pages 15-17.

51. Besides the above-referenced one-page table, the Plaintiffs have produced no evidence of any harm they suffered as a result of Meshi's one-time sale of 3,600 units of Star Gel to A to Z in November 2016. Khaskelis Decl. Ex. 5 ¶¶ 4, 8, 11, 14, 19; Khaskelis Decl. Ex. 7.

Response: Disputed. Plaintiffs produced plenty of evidence of the harm they suffered as a result of Meshi's counterfeiting, beyond the above-referenced table. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have

passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016, including in 2018, demonstrating a continuing business relationship with AZ. Khaskelis Decl. Ex. 1, section 30; Khaskelis Decl. Ex. 10, sections 21-27 in pages 8-9, sections 21-27 in pages 13-14, and pages 22-31; Rosenshine Decl. Ex. 1, sections 8-19 and 22-24; Rosenshine Decl. Ex. 2, pages 15-17.

52. The Plaintiffs failed to establish any connection between Meshi's one-time sale of 3,600 units of Star Gel to A to Z in November 2016 and losses to any other product sales, reputational damage, harm to goodwill, consumer confusion or general harm to the Plaintiffs' profits. *Id.*

Response: Disputed. Plaintiffs established a direct connection between Meshi's Star Gel® counterfeiting and losses of other product sales, reputational damage, harm to goodwill, consumer confusion, and general harm to Plaintiffs' profits. Plaintiffs produced plenty of evidence of the harm they suffered as a result of Meshi's counterfeiting. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016, including in 2018, demonstrating a continuing business relationship with AZ. Khaskelis Decl. Ex. 1, section 30; Khaskelis Decl. Ex. 10, sections 21-27 in pages 8-9, sections 21-27 in pages 13-14, page 16, and pages 22-31; Rosenshine Decl. Ex. 1, sections 8-19 and 22-24; Rosenshine Decl. Ex. 2, pages 15-17.

53. The Plaintiffs failed to show any reputational damage, consumer confusion, harm to goodwill or loss of Star Gel sales from October 2015 until March 2022. *Id.*

Response: Disputed. Plaintiffs established a direct connection between Meshi's Star Gel® counterfeiting and reputational damage, consumer confusion, harm to goodwill, and loss of Star Gel® sales from October 2015 until March 2022, among other damages. Plaintiffs produced plenty of evidence of the harm they suffered as a result of Meshi's counterfeiting.

Am. Compl. Ex. 5; Khaskelis Decl. Ex. 9; Khaskelis Decl. Ex. 10, sections 21-27 in pages 8-9, sections 21-27 in pages 13-14, page 16, and pages 22-31; Rosenshine Decl. Ex. 1, sections 8-19 and 22-24.

54. The Plaintiffs failed to show any harm to the sales of any other of their products. *Id.*

Response: Disputed. Plaintiffs established a direct connection between Meshi's Star Gel® counterfeiting and losses of other product sales and general harm to Plaintiffs' profits, among other damages. Plaintiffs produced plenty of evidence of the harm they suffered as a result of Meshi's counterfeiting. Khaskelis Decl. Ex. 10, sections 21-27 in pages 8-9, sections 21-27 in pages 13-14, and page 16; Rosenshine Decl. Ex. 1, sections 8-19 and 22-24.

55. The Plaintiffs failed to show that Star Gel was a famous or widely-recognized product. *Id.*

Response: Disputed. Plaintiffs established that Star Gel® is a famous and widely-recognized brand that is sold nationwide. Khaskelis Decl. Ex. 7. Rosenshine Decl. Ex. 1, sections 8-13, 23-24, 45, 48, 78, and 80-85.

56. The Plaintiffs produced no expert testimony in the matter. Khaskelis Decl. Ex. 7.

Response: Disputed. This statement of fact is not supported by the evidence cited by Meshi. Section 4 of Rosenshine Decl. Ex. 1 clearly states the qualifications of the declarant as an expert, qualifying him as an expert in the matter. Khaskelis Decl. Ex. 10, page 16; Rosenshine Decl. Ex. 1.

57. Pursuant to Judge Bloom's June 9, 2022 Order (ECF No. 89), all discovery in the matter is now closed.

Response: Undisputed to the extent the order speaks for itself.

58. On June 21, 2022, Meshi made an Offer of Judgment to the Plaintiffs in the amount of $5,000 pursuant to Rule 68 of the Federal Rules of Civil Procedure. Khaskelis Decl. Ex. 11. Meshi received no response to this offer within the timeframe specified therein. As such, this offer is deemed rejected.

Response: Undisputed.

## PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

1. Plaintiffs are the exclusive owners of the Star Gel® trademark. Am. Compl. Ex. 8.

2. On December 14, 2020, Plaintiffs served Meshi with formal requests for the production of documents ("Document Requests"). While the requests speak for themselves, they sought to establish the record of all sales of Star Gel® that Meshi undertook to any party aside from Plaintiffs or their predecessors, as well as all materials, including but not limited to, communications, documents, invoices, agreements, recordings, written correspondence such as emails/texts, etc., in Meshi's possession, custody, or control relating to all sales of Star Gel® ever made by Meshi to any other party besides Plaintiffs or their predecessors. Khaskelis Decl. Ex. 10, page 2.

3. The requests also asked to provide the ownership structure of Meshi, including all shareholders and their stakes in the company, directors, and executive managers. Khaskelis Decl. Ex. 10, page 2.

4. Plaintiffs repeatedly chased Meshi's attorneys for responses to their Document Requests after the deadline for the same has passed. Khaskelis Decl. Ex. 6, pages 3, 5-6, 8-9, 12, and 14-15.

5. On May 26, 2022, Meshi's attorneys finally produced some of the documents requested, showing communications between Meshi and AZ regarding the sales of counterfeit Star Gel®. The documents produced are missing messages and files that Meshi failed to produce. For example, the attached version that Mr. Yermi Mizrahi referred to on page 1 of Rosenshine Decl. Ex. 2; the letter referenced in page 4; the ledger referenced on page 5; the content of Mr. Noach's message on page 7; the attachment referenced on page 15; etc. Rosenshine Decl. Ex. 2.

6. In September 2016, Meshi made and executed an agreement with Plaintiffs' customer AZ, in which Meshi would sell a counterfeit version of Plaintiffs' Star Gel® hair gel to AZ. Rosenshine Decl. Ex. 2.

7. In the exchanges between the parties, Meshi supplied AZ with Plaintiffs' Star Gel® artwork file, asking AZ to approve an order of 3,600 units of counterfeit Star Gel® hair gel, mentioning that this is the version that Plaintiffs' predecessor (GMIE, managed by Ms. Edna Rosenshine) was purchasing. Rosenshine Decl. Ex. 2, pages 1-2.

8. The parties went ahead and completed the transaction for a total of $10,800. Khaskelis Decl. Ex. 9.

9. Meshi supplied the export paperwork for the order to a freight forwarder for export. Rosenshine Decl. Ex. 2, pages 10-14.

10. Meshi sold counterfeit Star Gel® hair gel that is identical to Plaintiffs' Star Gel® hair gel (identical artwork on identical hair gel product) to Plaintiffs' customer AZ, proving both potential and actual customer confusion. Am. Compl. Ex. 5; Khaskelis Decl. Ex. 9.

11. AZ has been selling the counterfeit Star Gel® for approximately $27 per unit, undercutting the genuine Star Gel® MSRP of $40 per unit. Rosenshine Decl. Ex. 1, section 16. Rosenshine Decl. Ex. 2.

12. AZ's sales of 3,600 counterfeit units of Star Gel® at a price of $27 per unit have yielded it a total of $97,200. Khaskelis Decl. Ex. 9. Rosenshine Decl. Ex. 2.

13. Meshi's counterfeit Star Gel® products have been circulating on the market past the trademark registration date. Rosenshine Decl. Ex. 2.

14. On June 27, 2018, Eichut Labels, the company that prints the Star Gel® labels, sent to Mr. Noach from AZ and Ms. Nava Mizrahi from Meshi a PDF file titled PastedGraphic-1.pdf, containing Plaintiffs' Star Gel® artwork, continuing the counterfeiting operation past the trademark registration date. Rosenshine Decl. Ex. 2, pages 15-17.

15. Star Gel® has been the flagship product of IG and its predecessors since its introduction in the year 2004. Rosenshine Decl. Ex. 1, section 8.

16. By virtue of being the exclusive private label of IG and its predecessors, Star Gel® served to attract clientele to the business who sought the brand, which could only be found at IG and its predecessors. Rosenshine Decl. Ex. 1, section 9.

17. IG and its predecessors successfully leveraged these new client relationships to upsell a wide variety of products to the new clientele brought to the business by Star Gel®. Rosenshine Decl. Ex. 1, section 10.

18. All other products offered for sale by IG and its predecessors, besides Star Gel®, were essentially commodities, subject to fierce price competition among vendors. Customers who were already purchasing Star Gel® from IG and its predecessors often found it more convenient to source these other products from IG and its predecessors as well, rather than purchase them from other suppliers, even if IG and its predecessors were not always the most cost-effective option for every single one of these other items. Thus, the Star Gel® products served as the only source of competitive advantage to IG and its predecessors. Rosenshine Decl. Ex. 1, section 11.

19. To that end, since its introduction in 2004, the Star Gel® brand has served as the backbone of IG's and its predecessors' business, generating complementary sales many times its own revenues in value. Virtually all revenues earned by IG and its predecessors prior to 2020 were generated by and/or dependent upon sales of Star Gel®. Rosenshine Decl. Ex. 1, section 12.

20. Toward the end of 2015, Mr. Eyal Noach ("Mr. Noach") told IG that he "finally found the manufacturer of Star Gel®" and that A to Z Import Inc. ("AZ") "will now be buying Star Gel® directly from the manufacturer" at a much lower price than IG's pricing. AZ then proceeded to solicit orders for Star Gel® and complementary products from numerous of IG's customers, offering them a lower price point for Star Gel® and diverting both Star Gel® sales and sales of complementary products from IG. Rosenshine Decl. Ex. 1, section 13.

21. IG's gross profits for the years 2015, 2016, 2017, 2018, and 2019 were $138,168, $113,940, $74,073, $64,132, and $498, respectively. Rosenshine Decl. Ex. 1, section 14.

22. IG's declining gross profits between the years 2015 and 2019 were a direct result of Star Gel® counterfeiting activities spearheaded by A. Meshi Cosmetics Industries Ltd. ("Meshi"). Meshi's counterfeiting of Star Gel® resulted in losses to Plaintiffs that consist of lost sales of Star Gel® products and lost sales of complementary products, among other losses. Meshi's counterfeiting caused both a diversion of sales of Star Gel® products and a diversion of sales of complementary products from Plaintiffs or their predecessors to others, including Meshi and AZ. Rosenshine Decl. Ex. 1, section 15.

23. Despite intense efforts to educate the public about the counterfeit Star Gel®, by 2020 IG's original line of business revolving around Star Gel®, including all complementary sales, was essentially dead due to rampant counterfeiting of the Star Gel® brand originating from Meshi. IG's concerted attempts to market the genuine Star Gel® products have been futile in the face of counterfeit Star Gel® merchandise being offered to consumers at approximately $27 per unit compared to the genuine Star Gel® MSRP of $40 per unit. Rosenshine Decl. Ex. 1, section 16.

24. Eventually, IG was forced to dispose of 1,008 units of Star Gel® (84 packs of 12) due to spoilage, after an extended period of failed attempts to sell them due to unfair competition from Meshi's counterfeit merchandise. Rosenshine Decl. Ex. 1, section 17.

25. Reeling from years of damage inflicted upon it by Meshi's counterfeiting activities, IG was forced to turn to new lines of business unrelated to Star Gel® in order to survive, while continuing its uphill battle to market the genuine Star Gel® in the face of a determined counterfeiting operation designed to aggressively undercut IG's pricing for genuine Star Gel® and drive it out of the market. Hence, IG's gross profits from 2020 to the present day consist of new lines of business unrelated to its original business model anchored by Star Gel®, despite its continued, unwavering efforts to sell the Star Gel® products, which persist to the present day. Rosenshine Decl. Ex. 1, section 18.

26. Meshi never took any action to stop the counterfeiting operation after placing the counterfeit Star Gel® products in the stream of commerce, even after IG's cease and desist letters were sent or the trademark was registered. Rampant counterfeiting by Meshi, AZ, and Mr. Noach (collectively, "Defendants") continues to this day, precluding any genuine

Star Gel® sales, never mind the need for IG to source additional stock. Rosenshine Decl. Ex. 1, section 19.

27. Plaintiffs could not locate the invoices for all Star Gel® sales by Plaintiffs' predecessors that occurred between the years 2013 and 2015 before the end of discovery. Hence, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in Exhibit ("Ex.") 7 of the Declaration of Allison Khaskelis in Support of the Local Rule 56.1 Statement Submitted by Defendant A. Meshi Cosmetics Industries Ltd. ("Khaskelis Decl."). Rosenshine Decl. Ex. 1, section 20.

28. Plaintiffs could not locate the invoices for Star Gel® sales by Plaintiffs' predecessors that occurred after 2015 before the end of discovery. Hence, there were sales of Star Gel® by Plaintiffs' predecessors after 2015, including after 2017, which are not documented in Khaskelis Decl. Ex. 7. Rosenshine Decl. Ex. 1, section 21.

29. In calculating the lost profits and damages to goodwill and reputation due to Meshi's counterfeiting, Plaintiffs used a 20% compound annual growth rate assumption in the table entitled "Computation of Lost Profits and Damages to Goodwill and Reputation" (Khaskelis Decl. Ex. 10). This assumption represents a fair estimate of future growth potential for IG's Star Gel®-anchored business model for 2016 and beyond, based on numerous factors, including, but not limited to, IG's business plans for 2016 and beyond, which included substantial increases in IG's marketing budget, expansion plans to target new customers, increased prices for the Star Gel® products, an increase in IG's complementary products offering, and other growth-oriented aspects, as well as the expected increased involvement of Plaintiffs in the management of the business for 2016 and beyond. Rosenshine Decl. Ex. 1, section 22.

30. In calculating the lost profits and damages to goodwill and reputation due to Meshi's counterfeiting, Plaintiffs used a 25% annual compounding/discount rate assumption in the table entitled "Computation of Lost Profits and Damages to Goodwill and Reputation" (Khaskelis Decl. Ex. 10). This assumption represents a fair estimate of the required return for investing in this type of business, reflecting an appropriate reward for the associated investment risk. This required return is also commensurate with the required return implied by various buyout offers Plaintiffs and their predecessors received for the business from potential investors over the years. Rosenshine Decl. Ex. 1, section 23.

31. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi (Khaskelis Decl. Ex. 1 section 30). As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Rosenshine Decl. Ex. 1, section 24.

32. Prior to 2012, Meshi agreed to credit GMIE for 804 defective units of Star Gel® that GMIE received from Meshi. The defective units included some units that were not completely full, some units that were discolored, some units that exhibited mold, some units that had damaged jars, etc. Meshi evidently failed to apply this credit to GMIE's account in its own records, as the credit does not appear anywhere on the general ledger that Meshi shared with Plaintiffs. Rosenshine Decl. Ex. 1, section 25.

33. There is no outstanding balance whatsoever due to Meshi from Plaintiffs or any of their predecessors. Rosenshine Decl. Ex. 1, section 26.

34. Meshi is a business that markets cosmetic products bearing its federally registered U.S. trademarks "Mon Platin", "Mon Platin Professional", and "Mon Platin DSM Dead Sea Minerals" across the United States, including New York State. Rosenshine Decl. Ex. 1, section 27.

35. As part of its business development strategy, Meshi actively solicits business in the U.S. by routinely participating as an exhibitor at various U.S. trade shows, operating a website in English targeted at U.S. customers, and engaging in extensive marketing efforts for its brand in the U.S., including the State of New York. Rosenshine Decl. Ex. 1, section 28.

36. Meshi actively solicits business in the State of New York, as can be clearly seen from a section of its website showing some of its affiliates representing it in the State of New York (Amended Complaint, Exhibit 1, "Website Screenshot"). Rosenshine Decl. Ex. 1, section 29.

37. In 2004, in an effort to expand its business operations in New York State, Meshi entered into a written agreement with GMIE, a New York corporation, to manufacture for GMIE a hair gel bearing GMIE's Star Gel® trademark (Amended Complaint, Exhibit 2, "Original Agreement"; Amended Complaint, Exhibit 3, "Translated Agreement"). Rosenshine Decl. Ex. 1, section 30.

38. According to section 7 of the agreement, GMIE has an exclusive right to the Star Gel® trademark with no time limit. Am. Compl. Exs. 2-3.

39. GMIE introduced the hair gel bearing its Star Gel® trademark to the U.S. market and sold it to retail customers and distributors across the U.S., including AZ and Mr. Noach, who used to deliver the Star Gel® hair gel on behalf of GMIE to GMIE's customers. Rosenshine Decl. Ex. 1, section 32.

40. AZ is a New York corporation based in Brooklyn, NY, that distributes grocery items, including products bearing Mr. Noach's federally registered U.S. trademarks "King Star Foods" and "JG Jasmine Gourmet", to retail stores across the U.S., including New York. Mr. Noach is the owner and manager of AZ. Rosenshine Decl. Ex. 1, section 33.

41. On July 31, 2014, GMIE signed a trademark assignment agreement with IG in which GMIE assigns all rights to the Star Gel® trademark to IG (Amended Complaint, Exhibit 4, "Assignment Agreement 1"). Rosenshine Decl. Ex. 1, section 34.

42. IG continued to market the Star Gel® brand in the U.S. in the same manner as GMIE. Rosenshine Decl. Ex. 1, section 35.

43. In November 2016, IG learned that Meshi has been actively deceiving IG's numerous U.S. customers, including AZ and Mr. Noach, by approaching them and selling them counterfeit

24

versions of the Star Gel® hair gel (see Exhibit 5 for genuine Star Gel® and counterfeit Star Gel®). Rosenshine Decl. Ex. 1, section 36.

44. Meshi has thereby effectively masterminded and established a sprawling counterfeiting operation targeted at IG's Star Gel® trademark, boasting multiple levels of distribution and retail channels across the supply chain throughout the U.S., including the State of New York, competing directly with IG and defrauding its customers. Rosenshine Decl. Ex. 1, section 37.

45. Meshi initiates, organizes, and directs the counterfeit Star Gel® operation, including, but not limited to, sourcing all the raw materials in the supply chain to bring the counterfeit Star Gel® to market; reproducing replica packaging for the counterfeit Star Gel® products; overseeing the manufacturing, production, storage, and distribution of the counterfeit Star Gel® products, including the associated logistics activities; directing promotional and marketing efforts of the counterfeit Star Gel® products across the U.S., including the State of New York; deceiving Plaintiffs' customers in the U.S., including New York, by approaching them, offering them, and selling them counterfeit Star Gel® merchandise; negotiating the terms of sales transactions of counterfeit Star Gel® merchandise with Plaintiffs' customers in the U.S., including New York; and collecting payments from Plaintiffs' customers in the U.S., including New York, for the illicit sales of the counterfeit Star Gel® merchandise. Rosenshine Decl. Ex. 1, section 38.

46. IG sent demand letters to Defendants on June 20, 2017, informing them of IG's valuable trademark rights and demanding that they cease all use of the Star Gel® trademark. Rosenshine Decl. Ex. 1, section 39.

47. Despite IG's demand from Defendants to stop the unauthorized distribution of its Star Gel® brand, Defendants continued to do so. Rosenshine Decl. Ex. 1, section 40.

48. Star Gel® is a registered trademark of IG, bearing the U.S. Trademark Registration Number 5,359,134. A true and correct copy of this registration is attached to the Amended Complaint as Exhibit 6. Rosenshine Decl. Ex. 1, section 41.

49. On January 31, 2018, IG signed a trademark assignment agreement with Elazar Rosenshine in which IG assigns all rights to the Star Gel® trademark to Elazar Rosenshine, and on January 1, 2019, Elazar Rosenshine signed a trademark assignment agreement with Plaintiffs in which Elazar Rosenshine assigns all rights to the Star Gel® trademark to Plaintiffs (Amended Complaint, Exhibit 7, "Assignment Agreement 2"; Amended Complaint, Exhibit 8, "Assignment Agreement 3"). Rosenshine Decl. Ex. 1, section 42.

50. Defendants continue to disregard Plaintiffs' demands and warnings to stop the unauthorized distribution of items that bear Plaintiffs' Star Gel® trademark. Rosenshine Decl. Ex. 1, section 43.

51. Defendants have refused to respect Plaintiffs' rights, despite repeated demands from Plaintiffs since that time. Rosenshine Decl. Ex. 1, section 44.

52. Plaintiffs have devoted substantial time, effort, and resources to the development and extensive promotion of the Star Gel® mark and the products offered thereunder. As a result of Plaintiffs' efforts, the public has come to recognize and rely upon the Star Gel® mark as an indication of the high quality associated with Plaintiffs' products. Rosenshine Decl. Ex. 1, section 45.

53. Plaintiffs have not consented to, sponsored, endorsed, or approved of Defendants' use of the Star Gel® trademark or any variations thereof in connection with the manufacture, marketing, or sale of any products or services. Rosenshine Decl. Ex. 1, section 46.

54. As of today, Defendants continue to use the Star Gel® trademark without authorization. Defendants' failure to comply with Plaintiffs' demands demonstrates a deliberate intent to continue wrongfully competing with Plaintiffs and to willfully counterfeit Plaintiffs' rights in the Star Gel® trademark. Rosenshine Decl. Ex. 1, section 47.

55. Defendants' actions are willful and reflect an intent to confuse consumers and profit from the goodwill and consumer recognition associated with Plaintiffs' mark. Rosenshine Decl. Ex. 1, section 48.

56. The products that Defendants are marketing and selling are offered through the same channels of distribution and to the same target customers as Plaintiffs' Star Gel® brand. Rosenshine Decl. Ex. 1, section 49.

57. Unless enjoined, the Defendants' conduct will continue to injure both Plaintiffs and the public. Rosenshine Decl. Ex. 1, section 50.

58. The products that are the subject of the Amended Complaint were, and continue to be, sold and/or offered for sale to customers, including consumers, in New York State, including in this Judicial District. Rosenshine Decl. Ex. 1, section 51.

59. Meshi routinely does business in New York State. Not only did Meshi engage in business and contract with GMIE (the original rights holder for the Star Gel® trademark), which was a New York corporation, but Meshi also intentionally counterfeits Plaintiffs' Star Gel® brand, a federally registered trademark, and sells it in the U.S., including in this judicial district in the State of New York. Rosenshine Decl. Ex. 1, section 52.

60. Meshi knowingly sells Plaintiffs' counterfeit Star Gel® trademark to customers in the U.S., some of which are based in New York, and therefore derives revenues and profits from its sales in New York. Meshi sells Plaintiffs' counterfeit Star Gel® brand in stores such as barbershops, hair salons, grocery stores, supermarkets, and pharmacies all over the U.S., including the State of New York and this judicial district. Thus, Meshi's contact with New York is systematic and continuous for a substantial period of time. Rosenshine Decl. Ex. 1, section 53.

61. The sale of Plaintiffs' counterfeit trademark in the U.S., including in New York, is the direct result of Meshi's manufacturing and sales of products bearing Plaintiffs' Star Gel® counterfeit trademark. Meshi conspires with AZ and Mr. Noach to counterfeit Plaintiffs' Star Gel® trademark and sell it in New York as well as elsewhere in the U.S. Rosenshine Decl. Ex. 1, section 54.

62. Meshi knowingly and willfully engages in its counterfeiting activities, as it actually removed the ™ sign from the artwork of its counterfeit product to demonstrate that it does not recognize Plaintiffs' rights to their trademark, and printed AZ's contact information on the counterfeit product's artwork as its agent in New York (complete with an address in New York indicating a Brooklyn location). This proves that Meshi knowingly makes New York sales of Plaintiffs' counterfeit Star Gel® trademark. Rosenshine Decl. Ex. 1, section 55.

63. Meshi's counterfeit merchandise bears labels that are written entirely in English (copied verbatim from Plaintiffs' original artwork and design), which are clearly intended for the U.S. market. Rosenshine Decl. Ex. 1, section 56.

64. AZ and Mr. Noach are both based in New York and routinely conduct business in New York State and across the U.S. Rosenshine Decl. Ex. 1, section 57.

65. Defendants have used spurious designations that are identical with, or substantially indistinguishable from, the Star Gel® trademark on goods covered by registration for the Star Gel® trademark. Rosenshine Decl. Ex. 1, section 58.

66. Defendants have used these spurious designations knowing they are counterfeit in connection with the advertisement, promotion, sale, offering for sale, and distribution of goods. Rosenshine Decl. Ex. 1, section 59.

67. Defendants' use of the Star Gel® trademark to advertise, promote, offer for sale, distribute and sell Defendants' goods was and is without the consent of Plaintiffs. Rosenshine Decl. Ex. 1, section 60.

68. Defendants' unauthorized use of the Star Gel® trademark on and in connection with Defendants' advertisement, promotion, sale, offering for sale, and distribution of goods constitute Defendants' use of the Star Gel® trademark in commerce. Rosenshine Decl. Ex. 1, section 61.

69. Defendants' unauthorized use of the Star Gel® trademark as set forth above is likely to: (a) cause confusion, mistake, and deception; (b) cause the public to believe that Defendants' goods are the same as Plaintiffs' goods or that Defendants are authorized, sponsored or approved by Plaintiffs or that Defendants are affiliated, connected or associated with or in some way related to Plaintiffs; and (c) result in Defendants unfairly benefiting from Plaintiffs' advertising and promotion and profiting from the reputation of Plaintiffs and their Star Gel® trademark all to the substantial and irreparable injury of the public, Plaintiffs and Plaintiffs' Star Gel® trademark and the substantial goodwill represented thereby. Rosenshine Decl. Ex. 1, section 62.

70. Defendants' acts are both willful and malicious. Rosenshine Decl. Ex. 1, section 63.

71. Plaintiffs' Star Gel® trademark is distinctive and associated in the mind of the public with the Plaintiffs. Rosenshine Decl. Ex. 1, section 64.

72. Additionally, based on the Plaintiffs' extensive advertising, sales, and the popularity of their own products, Plaintiffs' Star Gel® trademark has acquired secondary meaning so that the public associates the Star Gel® trademark exclusively with the Plaintiffs. Rosenshine Decl. Ex. 1, section 65.

73. Plaintiffs own all right, title, and interest in and to the Star Gel® trademark, as described above, including all common law rights in the Star Gel® trademark. Rosenshine Decl. Ex. 1, section 66.

74. The Defendants have used counterfeit reproductions of the Star Gel® trademark, in connection with the advertising, sale, offering for sale, and/or distribution of goods for their own financial gain. Rosenshine Decl. Ex. 1, section 67.

75. The products sold by Defendants incorporate imitations of Plaintiffs' common law trademark. Rosenshine Decl. Ex. 1, section 68.

76. Plaintiffs have not authorized the Defendants' use of the Star Gel® trademark. Rosenshine Decl. Ex. 1, section 69.

77. The Defendants' unauthorized use of Plaintiffs' Star Gel® trademark constitutes the use of Plaintiffs' registered marks in commerce. Rosenshine Decl. Ex. 1, section 70.

78. The Defendants' unauthorized use of Plaintiffs' Star Gel® trademark is causing confusion, mistake, and deception to the public that believes that the Defendants' products emanate or originate from the Plaintiffs, when they do not, or that the Plaintiffs have authorized, sponsored, approved, or otherwise associated themselves with the Defendants or their counterfeiting products bearing the Plaintiffs' trademark. Rosenshine Decl. Ex. 1, section 71.

79. The Defendants' unauthorized use of the Plaintiffs' Star Gel® trademark has resulted in the Defendants unfairly and illegally benefitting from the Plaintiffs' goodwill. Rosenshine Decl. Ex. 1, section 72.

80. This conduct has caused substantial and irreparable injury to the public, to Plaintiffs, to Plaintiffs' trademark, and the substantial goodwill represented thereby. Rosenshine Decl. Ex. 1, section 73.

81. The Defendants' acts have caused, and will continue to cause, irreparable injury to the Plaintiffs. Rosenshine Decl. Ex. 1, section 74.

82. The Defendants' egregious conduct in repeatedly selling counterfeit merchandise bearing the unauthorized Plaintiffs' Star Gel® trademark is willful and intentional, constituting an exceptional case. Rosenshine Decl. Ex. 1, section 75.

83. The actions of Defendants were undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case. Rosenshine Decl. Ex. 1, section 76.

84. By making unauthorized use, in interstate commerce, of Plaintiffs' Star Gel® trademark, the Defendants have used a "false designation of origin" that causes confusion, mistake, and deception as to the affiliation or connection of the Defendants with Plaintiffs and as to the origin, sponsorship, association or approval of the Defendants' services and goods by Plaintiffs. Rosenshine Decl. Ex. 1, section 77.

85. Defendants engage in counterfeiting of the Star Gel® product packaging design, consisting of a one-liter clear transparent plastic round jar with a diameter of 4.75 inches and a height of 5.25 inches, capped with a round, glossy white plastic dome-like screw cap overhanging the circumference of the jar, and printed with the distinctive Star Gel® logo in black faux-script lettering that features a capital letter "G" that incorporates a capital letter "J" in its design, which stands for "Jojoba" (the key ingredient), and replaces the letter "a" with a hollow five-point star. Additionally, the slogan "The Top Jojoba Hair Gel" is printed below the Star Gel® logo in the same font, terminating at the bottom of the letter "G". Below the logo and the slogan, the word "Jojoba" is printed in the center, and below it, the words "Hair Gel" are printed between two horizontal lines. All these design elements consist of the distinctive Star Gel® product packaging design, which has acquired

secondary meaning in the marketplace and is instantly recognizable to customers in New York and across the U.S., serving the source-identification function for them. By slavishly copying all these design elements, Defendants seek to appropriate Plaintiffs' original design and capitalize on their brand recognition in New York and across the U.S., fully intending to defraud the public at large. Rosenshine Decl. Ex. 1, section 78.

86. Defendants' acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent the Defendants' products as those of Plaintiffs. Rosenshine Decl. Ex. 1, section 79.

87. The Star Gel® trademark is famous and distinctive. The Star Gel® brand is well known by customers in New York and across the U.S., thanks to many years of devoted, extensive marketing efforts by Plaintiffs and their predecessors. Rosenshine Decl. Ex. 1, section 80; Khaskelis Decl. Ex. 10, section 14 in page 8 and section 14 in page 13.

88. The Star Gel® trademark is a distinctive mark that has been in use for many years and plays a prominent role in Plaintiffs' marketing, advertising, and the popularity of their products across many different media. Rosenshine Decl. Ex. 1, section 81.

89. The Star Gel® trademark has been through prominent, long, and continuous use in commerce, becoming, and continues to become, famous and distinctive. Rosenshine Decl. Ex. 1, section 82.

90. The Star Gel® trademark is famous long before the Defendants began using unauthorized reproductions, counterfeits, copies, and colorable imitations on their unauthorized merchandise. Rosenshine Decl. Ex. 1, section 83.

91. Long after the Star Gel® trademark became famous, the Defendants, without authorization from Plaintiffs, used unauthorized reproductions, counterfeits, copies, and colorable imitations of the Star Gel® trademark. Rosenshine Decl. Ex. 1, section 84.

92. The Star Gel® trademark has gained widespread publicity and public recognition in New York and elsewhere. Rosenshine Decl. Ex. 1, section 85.

93. The Defendants' sale of goods that use the Star Gel® trademark constitutes use in commerce of Plaintiffs' Star Gel® trademark. Rosenshine Decl. Ex. 1, section 86.

94. Plaintiffs have not licensed or otherwise authorized the Defendants' use of their Star Gel® trademark. Rosenshine Decl. Ex. 1, section 87.

95. Defendants' unauthorized use of the Star Gel® trademark causes consumers to locate and purchase the Defendants' products in the erroneous belief that the Defendants are associated with, sponsored by or affiliated with Plaintiffs, and/or that Plaintiffs are the source of those products. Rosenshine Decl. Ex. 1, section 88.

96. The Defendants' use of Plaintiffs' Star Gel® trademark dilutes and/or is likely to dilute the distinctive quality of those marks and to lessen the capacity of such marks to identify and distinguish Plaintiffs' goods. Rosenshine Decl. Ex. 1, section 89.

97. The Defendants' unlawful use of the Star Gel® trademark, in connection with inferior goods, is also likely to tarnish that trademark and cause blurring in the minds of consumers

between Plaintiffs and the Defendants, thereby lessening the value of Plaintiffs' Star Gel® trademark, as unique identifiers of Plaintiffs' products. Rosenshine Decl. Ex. 1, section 90.

98. By the acts described above, the Defendants have diluted, and are likely to dilute the distinctiveness of the Star Gel® trademark, and caused a likelihood of harm to Plaintiffs' business reputation. Rosenshine Decl. Ex. 1, section 91.

99. As a direct result of Defendants' actions, Plaintiffs have suffered and continue to suffer damages consisting of, among other things, diminution in the value of and goodwill associated with the Star Gel® mark, and injury to Plaintiffs' business. Rosenshine Decl. Ex. 1, section 92.

100. Defendants' actions described above and specifically, without limitation, Defendants' use of the Star Gel® trademark, and confusingly similar variations thereof, in commerce to advertise, market, and sell goods that use the Star Gel® trademark throughout the United States including New York, constitute unfair competition and false advertising. Rosenshine Decl. Ex. 1, section 93.

101. The Defendants have palmed off their goods as Plaintiffs', improperly trading upon the Plaintiffs' goodwill and valuable rights including Star Gel® trademark. Rosenshine Decl. Ex. 1, section 94.

102. Through their importation, advertisement, distribution, offer to sell and sale of unauthorized products bearing the Star Gel® trademark, Defendants have engaged in consumer-oriented conduct that has affected the public interest of the United States including New York and has resulted in injury to consumers throughout the United States including New York. Rosenshine Decl. Ex. 1, section 95.

103. The Defendants' deceptive acts or practices, as described herein, are materially misleading. Such acts or practices have deceived or have a tendency to deceive a material segment of the public to whom the Defendants have directed their marketing activities, and Plaintiffs have been injured thereby. Rosenshine Decl. Ex. 1, section 96.

104. The Defendants have committed the above-alleged acts willfully, and in conscious disregard of Plaintiffs' rights. Rosenshine Decl. Ex. 1, section 97.

105. By the acts described above, the Defendants have engaged in unfair competition. Rosenshine Decl. Ex. 1, section 98.

106. Customers, including consumers, are misled and deceived by Defendants' representations regarding Plaintiffs' Star Gel® trademark. Rosenshine Decl. Ex. 1, section 99.

107. Defendants knew or should have known that their statements were false or likely to mislead. Rosenshine Decl. Ex. 1, section 100.

108. Defendants have been unjustly enriched by illegally using and misappropriating Plaintiffs' intellectual property for Defendants' own financial gain. Rosenshine Decl. Ex. 1, section 101.

109. As an actual and proximate result of Defendants' willful and intentional actions, Plaintiffs have suffered and continue to suffer damages including irreparable harm and damage to their business, reputation, and goodwill. Rosenshine Decl. Ex. 1, section 102.

110.     The actions of Defendants described above and specifically, without limitation, their knowledge, participation, and inducement of the unauthorized use of the Star Gel® trademark, and confusingly similar variations thereof, in commerce to advertise, market, and sell Star Gel® products throughout the United States and New York, constitute contributory trademark counterfeiting and infringement. Rosenshine Decl. Ex. 1, section 103.

111.     The actions of Defendants as alleged above were a real agreement or confederation with a common design to perpetrate one or more torts for an unlawful purpose or by an unlawful means. Rosenshine Decl. Ex. 1, section 104.

112.     Each and every Defendant is equally and vicariously liable to Plaintiffs for their damages proximately caused thereby. Rosenshine Decl. Ex. 1, section 105.

113.     Plaintiffs have performed all conditions, covenants, and promises required to be performed by Plaintiffs in accordance with the terms of their written agreement with Meshi (Amended Complaint, Exhibit 2, "Original Agreement"; Amended Complaint, Exhibit 3, "Translated Agreement"). Rosenshine Decl. Ex. 1, section 106.

114.     As detailed above, Meshi has breached, and continues to breach, § 7 of its written agreement with Plaintiffs by selling merchandise bearing Plaintiffs' Star Gel® trademark to third parties, including Plaintiffs' New York customers. Rosenshine Decl. Ex. 1, section 107.

115.     Meshi has breached, and continues to breach, its written agreement with Plaintiffs by unfairly interfering with Plaintiffs' right to receive the benefits of the agreement, by contracting with third parties, including Plaintiffs' New York customers, in a manner that capitalizes on Plaintiffs' well-known Star Gel® trademark and deprives Plaintiffs of profits from its commercial exploitation. Rosenshine Decl. Ex. 1, section 108.

116.     As a direct and proximate result of Meshi's breaches of its written agreement with Plaintiffs as aforesaid, Plaintiffs have suffered, and will continue to suffer, enormous monetary damages. Rosenshine Decl. Ex. 1, section 109.

117.     Meshi never submitted initial disclosures. Rosenshine Decl. Ex. 1, section 110.

118.     Plaintiffs, their predecessors, and their family members have suffered enormous damages as a result of Defendants' counterfeiting of the Star Gel® products. Khaskelis Decl. Ex. 10, section 21 in page 8 and section 21 in page 13.

119.     Plaintiffs, their predecessors, and their family members have lost sales of the Star Gel® products, have lost sales of complementary products, and have suffered lasting goodwill and reputational damages. Khaskelis Decl. Ex. 10, section 22 in page 8 and section 22 in page 13.

120.     Since 2016, when Plaintiffs, their predecessors, and their family members learned of Defendants' counterfeiting activities, they have all been spending countless hours educating customers on how to distinguish between genuine and counterfeit Star Gel® products. Khaskelis Decl. Ex. 10, section 23 in page 8 and section 23 in page 13.

121.     Despite their best efforts, rampant confusion persists among customers of the Star Gel® products as a consequence of Defendants' counterfeiting activities. Khaskelis Decl. Ex. 10, section 24 in page 9 and section 24 in page 14.

122.  Plaintiffs' and their predecessors' integrity in the market as the exclusive owners of the Star Gel® trademark has been severely compromised and permanently impaired as a consequence of Defendants' counterfeiting activities. Khaskelis Decl. Ex. 10, section 25 in page 9 and section 25 in page 14.

123.  Plaintiffs, their predecessors, and their family members have suffered severe emotional distress and mental anguish as a result of Defendants' counterfeiting activities. Khaskelis Decl. Ex. 10, section 26 in page 9 and section 26 in page 14.


Respectfully submitted,


Dated: <u>October 17, 2022</u>


<u>/s/ *Oren Rosenshine*</u>    <u>/s/ *Amir Rosenshine*</u>

Oren Rosenshine        Amir Rosenshine

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

Oren Rosenshine

    20 Hawthorne Lane

    Great Neck, NY 11023

Amir Rosenshine

    20 Hawthorne Lane

    Great Neck, NY 11023

Plaintiffs,

  **-against-**

1) A. Meshi Cosmetics Industries Ltd.

    8 Shimon Habursakai Street

    Industrial Park Bat Yam 59598

    Israel

2) A to Z Import Inc.

    305 E 88th Street

    Brooklyn, NY 11236

3) Eyal Noach

    2445 E 65th Street

    Brooklyn, NY 11234

Defendants.

Case No.

18CV3572(LDH)(LB)

**DECLARATION OF OREN ROSENSHINE IN SUPPORT OF
PLAINTIFFS' RESPONSE TO DEFENDANT A. MESHI COSMETICS INDUSTRIES
LTD.'S LOCAL RULE 56.1 STATEMENT**

OREN ROSENSHINE, Pro Se Plaintiff, declares the following:

1. I am fully familiar with the facts and circumstances set forth herein.

2. Attached are true and correct copies of the following documents:

   Exhibit 1:    Declaration of Amir Rosenshine dated October 17, 2022

   Exhibit 2:    Communications between A. Meshi Cosmetics Industries Ltd. and A to Z Import Inc. including translations


Dated: October 17, 2022

   Great Neck, New York

   /s/ *Oren Rosenshine*
   Oren Rosenshine

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

<table>
<tr><td>
Oren Rosenshine

Amir Rosenshine

Plaintiffs,

   **-against-**

1) A. Meshi Cosmetics Industries Ltd.
2) A to Z Import Inc.
3) Eyal Noach

Defendants.
</td><td>
Case No.
      18cv3572(LDH)(LB)
</td></tr>
</table>

**DECLARATION OF AMIR ROSENSHINE**

I, Amir Rosenshine, hereby declare as follows:

1. I am over the age of 18 and I am otherwise competent to make this declaration. I am providing this declaration voluntarily.

2. All the statements herein are within my personal knowledge and are true and correct to the best of my knowledge.

3. The following statements are true during the entire period at issue in the Amended Complaint and currently.

1

4. I am co-plaintiff in the Amended Complaint with Oren Rosenshine (collectively, "Plaintiffs"). I hold an MBA in Finance and have the valuation expertise required to assess the value of lost profits and damages to goodwill and reputation alleged by Plaintiffs.

5. I am the co-founder of International Grooming, Inc. ("IG") and have been serving as its co-CEO since inception. Among other responsibilities, I have been doing all the accounting for the company on my own since inception including tax returns preparation.

6. I have been intimately familiar with IG's business model, marketing strategy, customers, vendors, financials, and all other aspects of the company's activities since its inception.

7. I have been intimately familiar with Global Manufacturing Import Export, Inc.'s ("GMIE") business model, marketing strategy, customers, vendors, financials, and all other aspects of the company's activities since its inception.

8. Star Gel® has been the flagship product of IG and its predecessors since its introduction in the year 2004.

9. By virtue of being the exclusive private label of IG and its predecessors, Star Gel® served to attract clientele to the business who sought the brand, which could only be found at IG and its predecessors.

10. IG and its predecessors successfully leveraged these new client relationships to upsell a wide variety of products to the new clientele brought to the business by Star Gel®.

11. All other products offered for sale by IG and its predecessors, besides Star Gel®, were essentially commodities, subject to fierce price competition among vendors. Customers who were already purchasing Star Gel® from IG and its predecessors often found it more convenient to source these other products from IG and its predecessors as well, rather than purchase them from other suppliers, even if IG and its predecessors were not always the most cost-effective option for every single one of these other items. Thus, the Star Gel® products served as the only source of competitive advantage to IG and its predecessors.

12. To that end, since its introduction in 2004, the Star Gel® brand has served as the backbone of IG's and its predecessors' business, generating complementary sales many times its own revenues in value. Virtually all revenues earned by IG and its predecessors prior to 2020 were generated by and/or dependent upon sales of Star Gel®.

13. Toward the end of 2015, Mr. Eyal Noach ("Mr. Noach") told IG that he "finally found the manufacturer of Star Gel®" and that A to Z Import Inc. ("AZ") "will now be buying Star Gel® directly from the manufacturer" at a much lower price than IG's pricing. AZ then proceeded to solicit orders for Star Gel® and complementary products from numerous of IG's customers, offering them a lower price point for Star Gel® and diverting both Star Gel® sales and sales of complementary products from IG.

14. IG's gross profits for the years 2015, 2016, 2017, 2018, and 2019 were $138,168, $113,940, $74,073, $64,132, and $498, respectively.

15. IG's declining gross profits between the years 2015 and 2019 were a direct result of Star Gel® counterfeiting activities spearheaded by A. Meshi Cosmetics Industries Ltd. ("Meshi"). Meshi's counterfeiting of Star Gel® resulted in losses to Plaintiffs that consist of lost sales of Star Gel® products and lost sales of complementary products, among other losses. Meshi's counterfeiting caused both a diversion of sales of Star Gel® products and

a diversion of sales of complementary products from Plaintiffs or their predecessors to others, including Meshi and AZ.

16. Despite intense efforts to educate the public about the counterfeit Star Gel®, by 2020 IG's original line of business revolving around Star Gel®, including all complementary sales, was essentially dead due to rampant counterfeiting of the Star Gel® brand originating from Meshi. IG's concerted attempts to market the genuine Star Gel® products have been futile in the face of counterfeit Star Gel® merchandise being offered to consumers at approximately $27 per unit compared to the genuine Star Gel® MSRP of $40 per unit.

17. Eventually, IG was forced to dispose of 1,008 units of Star Gel® (84 packs of 12) due to spoilage, after an extended period of failed attempts to sell them due to unfair competition from Meshi's counterfeit merchandise.

18. Reeling from years of damage inflicted upon it by Meshi's counterfeiting activities, IG was forced to turn to new lines of business unrelated to Star Gel® in order to survive, while continuing its uphill battle to market the genuine Star Gel® in the face of a determined counterfeiting operation designed to aggressively undercut IG's pricing for genuine Star Gel® and drive it out of the market. Hence, IG's gross profits from 2020 to the present day consist of new lines of business unrelated to its original business model anchored by Star Gel®, despite its continued, unwavering efforts to sell the Star Gel® products, which persist to the present day.

19. Meshi never took any action to stop the counterfeiting operation after placing the counterfeit Star Gel® products in the stream of commerce, even after IG's cease and desist letters were sent or the trademark was registered. Rampant counterfeiting by Meshi, AZ, and Mr. Noach (collectively, "Defendants") continues to this day, precluding any genuine Star Gel® sales, never mind the need for IG to source additional stock.

20. Plaintiffs could not locate the invoices for all Star Gel® sales by Plaintiffs' predecessors that occurred between the years 2013 and 2015 before the end of discovery. Hence, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in Exhibit ("Ex.") 7 of the Declaration of Allison Khaskelis in Support of the Local Rule 56.1 Statement Submitted by Defendant A. Meshi Cosmetics Industries Ltd. ("Khaskelis Decl.").

21. Plaintiffs could not locate the invoices for Star Gel® sales by Plaintiffs' predecessors that occurred after 2015 before the end of discovery. Hence, there were sales of Star Gel® by Plaintiffs' predecessors after 2015, including after 2017, which are not documented in Khaskelis Decl. Ex. 7.

22. In calculating the lost profits and damages to goodwill and reputation due to Meshi's counterfeiting, Plaintiffs used a 20% compound annual growth rate assumption in the table entitled "Computation of Lost Profits and Damages to Goodwill and Reputation" (Khaskelis Decl. Ex. 10). This assumption represents a fair estimate of future growth potential for IG's Star Gel®-anchored business model for 2016 and beyond, based on numerous factors, including, but not limited to, IG's business plans for 2016 and beyond, which included substantial increases in IG's marketing budget, expansion plans to target new customers, increased prices for the Star Gel® products, an increase in IG's complementary products offering, and other growth-oriented aspects, as well as the

expected increased involvement of Plaintiffs in the management of the business for 2016 and beyond.

23. In calculating the lost profits and damages to goodwill and reputation due to Meshi's counterfeiting, Plaintiffs used a 25% annual compounding/discount rate assumption in the table entitled "Computation of Lost Profits and Damages to Goodwill and Reputation" (Khaskelis Decl. Ex. 10). This assumption represents a fair estimate of the required return for investing in this type of business, reflecting an appropriate reward for the associated investment risk. This required return is also commensurate with the required return implied by various buyout offers Plaintiffs and their predecessors received for the business from potential investors over the years.

24. Plaintiffs strongly believe that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi (Khaskelis Decl. Ex. 1 section 30). As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison.

25. Prior to 2012, Meshi agreed to credit GMIE for 804 defective units of Star Gel® that GMIE received from Meshi. The defective units included some units that were not completely full, some units that were discolored, some units that exhibited mold, some units that had damaged jars, etc. Meshi evidently failed to apply this credit to GMIE's account in its own records, as the credit does not appear anywhere on the general ledger that Meshi shared with Plaintiffs.

26. There is no outstanding balance whatsoever due to Meshi from Plaintiffs or any of their predecessors.

27. Meshi is a business that markets cosmetic products bearing its federally registered U.S. trademarks "Mon Platin", "Mon Platin Professional", and "Mon Platin DSM Dead Sea Minerals" across the United States, including New York State.

28. As part of its business development strategy, Meshi actively solicits business in the U.S. by routinely participating as an exhibitor at various U.S. trade shows, operating a website in English targeted at U.S. customers, and engaging in extensive marketing efforts for its brand in the U.S., including the State of New York.

29. Meshi actively solicits business in the State of New York, as can be clearly seen from a section of its website showing some of its affiliates representing it in the State of New York (Amended Complaint, Exhibit 1, "Website Screenshot").

30. In 2004, in an effort to expand its business operations in New York State, Meshi entered into a written agreement with GMIE, a New York corporation, to manufacture for GMIE

4

a hair gel bearing GMIE's Star Gel® trademark (Amended Complaint, Exhibit 2, "Original Agreement"; Amended Complaint, Exhibit 3, "Translated Agreement").

31. According to section 7 of the agreement, GMIE has an exclusive right to the Star Gel® trademark with no time limit.

32. GMIE introduced the hair gel bearing its Star Gel® trademark to the U.S. market and sold it to retail customers and distributors across the U.S., including AZ and Mr. Noach, who used to deliver the Star Gel® hair gel on behalf of GMIE to GMIE's customers.

33. AZ is a New York corporation based in Brooklyn, NY, that distributes grocery items, including products bearing Mr. Noach's federally registered U.S. trademarks "King Star Foods" and "JG Jasmine Gourmet", to retail stores across the U.S., including New York. Mr. Noach is the owner and manager of AZ.

34. On July 31, 2014, GMIE signed a trademark assignment agreement with IG in which GMIE assigns all rights to the Star Gel® trademark to IG (Amended Complaint, Exhibit 4, "Assignment Agreement 1").

35. IG continued to market the Star Gel® brand in the U.S. in the same manner as GMIE.

36. In November 2016, IG learned that Meshi has been actively deceiving IG's numerous U.S. customers, including AZ and Mr. Noach, by approaching them and selling them counterfeit versions of the Star Gel® hair gel (see Exhibit 5 for genuine Star Gel® and counterfeit Star Gel®).

37. Meshi has thereby effectively masterminded and established a sprawling counterfeiting operation targeted at IG's Star Gel® trademark, boasting multiple levels of distribution and retail channels across the supply chain throughout the U.S., including the State of New York, competing directly with IG and defrauding its customers.

38. Meshi initiates, organizes, and directs the counterfeit Star Gel® operation, including, but not limited to, sourcing all the raw materials in the supply chain to bring the counterfeit Star Gel® to market; reproducing replica packaging for the counterfeit Star Gel® products; overseeing the manufacturing, production, storage, and distribution of the counterfeit Star Gel® products, including the associated logistics activities; directing promotional and marketing efforts of the counterfeit Star Gel® products across the U.S., including the State of New York; deceiving Plaintiffs' customers in the U.S., including New York, by approaching them, offering them, and selling them counterfeit Star Gel® merchandise; negotiating the terms of sales transactions of counterfeit Star Gel® merchandise with Plaintiffs' customers in the U.S., including New York; and collecting payments from Plaintiffs' customers in the U.S., including New York, for the illicit sales of the counterfeit Star Gel® merchandise.

39. IG sent demand letters to Defendants on June 20, 2017, informing them of IG's valuable trademark rights and demanding that they cease all use of the Star Gel® trademark.

40. Despite IG's demand from Defendants to stop the unauthorized distribution of its Star Gel® brand, Defendants continued to do so.

41. Star Gel® is a registered trademark of IG, bearing the U.S. Trademark Registration Number 5,359,134. A true and correct copy of this registration is attached to the Amended Complaint as Exhibit 6.

5

42. On January 31, 2018, IG signed a trademark assignment agreement with Elazar Rosenshine in which IG assigns all rights to the Star Gel® trademark to Elazar Rosenshine, and on January 1, 2019, Elazar Rosenshine signed a trademark assignment agreement with Plaintiffs in which Elazar Rosenshine assigns all rights to the Star Gel® trademark to Plaintiffs (Amended Complaint, Exhibit 7, "Assignment Agreement 2"; Amended Complaint, Exhibit 8, "Assignment Agreement 3").

43. Defendants continue to disregard Plaintiffs' demands and warnings to stop the unauthorized distribution of items that bear Plaintiffs' Star Gel® trademark.

44. Defendants have refused to respect Plaintiffs' rights, despite repeated demands from Plaintiffs since that time.

45. Plaintiffs have devoted substantial time, effort, and resources to the development and extensive promotion of the Star Gel® mark and the products offered thereunder. As a result of Plaintiffs' efforts, the public has come to recognize and rely upon the Star Gel® mark as an indication of the high quality associated with Plaintiffs' products.

46. Plaintiffs have not consented to, sponsored, endorsed, or approved of Defendants' use of the Star Gel® trademark or any variations thereof in connection with the manufacture, marketing, or sale of any products or services.

47. As of today, Defendants continue to use the Star Gel® trademark without authorization. Defendants' failure to comply with Plaintiffs' demands demonstrates a deliberate intent to continue wrongfully competing with Plaintiffs and to willfully counterfeit Plaintiffs' rights in the Star Gel® trademark.

48. Defendants' actions are willful and reflect an intent to confuse consumers and profit from the goodwill and consumer recognition associated with Plaintiffs' mark.

49. The products that Defendants are marketing and selling are offered through the same channels of distribution and to the same target customers as Plaintiffs' Star Gel® brand.

50. Unless enjoined, the Defendants' conduct will continue to injure both Plaintiffs and the public.

51. The products that are the subject of the Amended Complaint were, and continue to be, sold and/or offered for sale to customers, including consumers, in New York State, including in this Judicial District.

52. Meshi routinely does business in New York State. Not only did Meshi engage in business and contract with GMIE (the original rights holder for the Star Gel® trademark), which was a New York corporation, but Meshi also intentionally counterfeits Plaintiffs' Star Gel® brand, a federally registered trademark, and sells it in the U.S., including in this judicial district in the State of New York.

53. Meshi knowingly sells Plaintiffs' counterfeit Star Gel® trademark to customers in the U.S., some of which are based in New York, and therefore derives revenues and profits from its sales in New York. Meshi sells Plaintiffs' counterfeit Star Gel® brand in stores such as barbershops, hair salons, grocery stores, supermarkets, and pharmacies all over the U.S., including the State of New York and this judicial district. Thus, Meshi's contact with New York is systematic and continuous for a substantial period of time.

54. The sale of Plaintiffs' counterfeit trademark in the U.S., including in New York, is the direct result of Meshi's manufacturing and sales of products bearing Plaintiffs' Star Gel® counterfeit trademark. Meshi conspires with AZ and Mr. Noach to counterfeit Plaintiffs' Star Gel® trademark and sell it in New York as well as elsewhere in the U.S.

55. Meshi knowingly and willfully engages in its counterfeiting activities, as it actually removed the ™ sign from the artwork of its counterfeit product to demonstrate that it does not recognize Plaintiffs' rights to their trademark, and printed AZ's contact information on the counterfeit product's artwork as its agent in New York (complete with an address in New York indicating a Brooklyn location). This proves that Meshi knowingly makes New York sales of Plaintiffs' counterfeit Star Gel® trademark.

56. Meshi's counterfeit merchandise bears labels that are written entirely in English (copied verbatim from Plaintiffs' original artwork and design), which are clearly intended for the U.S. market.

57. AZ and Mr. Noach are both based in New York and routinely conduct business in New York State and across the U.S.

58. Defendants have used spurious designations that are identical with, or substantially indistinguishable from, the Star Gel® trademark on goods covered by registration for the Star Gel® trademark.

59. Defendants have used these spurious designations knowing they are counterfeit in connection with the advertisement, promotion, sale, offering for sale, and distribution of goods.

60. Defendants' use of the Star Gel® trademark to advertise, promote, offer for sale, distribute and sell Defendants' goods was and is without the consent of Plaintiffs.

61. Defendants' unauthorized use of the Star Gel® trademark on and in connection with Defendants' advertisement, promotion, sale, offering for sale, and distribution of goods constitute Defendants' use of the Star Gel® trademark in commerce.

62. Defendants' unauthorized use of the Star Gel® trademark as set forth above is likely to: (a) cause confusion, mistake, and deception; (b) cause the public to believe that Defendants' goods are the same as Plaintiffs' goods or that Defendants are authorized, sponsored or approved by Plaintiffs or that Defendants are affiliated, connected or associated with or in some way related to Plaintiffs; and (c) result in Defendants unfairly benefiting from Plaintiffs' advertising and promotion and profiting from the reputation of Plaintiffs and their Star Gel® trademark all to the substantial and irreparable injury of the public, Plaintiffs and Plaintiffs' Star Gel® trademark and the substantial goodwill represented thereby.

63. Defendants' acts are both willful and malicious.

64. Plaintiffs' Star Gel® trademark is distinctive and associated in the mind of the public with the Plaintiffs.

65. Additionally, based on the Plaintiffs' extensive advertising, sales, and the popularity of their own products, Plaintiffs' Star Gel® trademark has acquired secondary meaning so that the public associates the Star Gel® trademark exclusively with the Plaintiffs.

66. Plaintiffs own all right, title, and interest in and to the Star Gel® trademark, as described above, including all common law rights in the Star Gel® trademark.

67. The Defendants have used counterfeit reproductions of the Star Gel® trademark, in connection with the advertising, sale, offering for sale, and/or distribution of goods for their own financial gain.

68. The products sold by Defendants incorporate imitations of Plaintiffs' common law trademark.

69. Plaintiffs have not authorized the Defendants' use of the Star Gel® trademark.

70. The Defendants' unauthorized use of Plaintiffs' Star Gel® trademark constitutes the use of Plaintiffs' registered marks in commerce.

71. The Defendants' unauthorized use of Plaintiffs' Star Gel® trademark is causing confusion, mistake, and deception to the public that believes that the Defendants' products emanate or originate from the Plaintiffs, when they do not, or that the Plaintiffs have authorized, sponsored, approved, or otherwise associated themselves with the Defendants or their counterfeiting products bearing the Plaintiffs' trademark.

72. The Defendants' unauthorized use of the Plaintiffs' Star Gel® trademark has resulted in the Defendants unfairly and illegally benefitting from the Plaintiffs' goodwill.

73. This conduct has caused substantial and irreparable injury to the public, to Plaintiffs, to Plaintiffs' trademark, and the substantial goodwill represented thereby.

74. The Defendants' acts have caused, and will continue to cause, irreparable injury to the Plaintiffs.

75. The Defendants' egregious conduct in repeatedly selling counterfeit merchandise bearing the unauthorized Plaintiffs' Star Gel® trademark is willful and intentional, constituting an exceptional case.

76. The actions of Defendants were undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case.

77. By making unauthorized use, in interstate commerce, of Plaintiffs' Star Gel® trademark, the Defendants have used a "false designation of origin" that causes confusion, mistake, and deception as to the affiliation or connection of the Defendants with Plaintiffs and as to the origin, sponsorship, association or approval of the Defendants' services and goods by Plaintiffs.

78. Defendants engage in counterfeiting of the Star Gel® product packaging design, consisting of a one-liter clear transparent plastic round jar with a diameter of 4.75 inches and a height of 5.25 inches, capped with a round, glossy white plastic dome-like screw cap overhanging the circumference of the jar, and printed with the distinctive Star Gel® logo in black faux-script lettering that features a capital letter "G" that incorporates a capital letter "J" in its design, which stands for "Jojoba" (the key ingredient), and replaces the letter "a" with a hollow five-point star. Additionally, the slogan "The Top Jojoba Hair Gel" is printed below the Star Gel® logo in the same font, terminating at the bottom of the letter "G". Below the logo and the slogan, the word "Jojoba" is printed in the center, and below it, the words "Hair Gel" are printed between two horizontal lines. All these design elements

8

consist of the distinctive Star Gel® product packaging design, which has acquired secondary meaning in the marketplace and is instantly recognizable to customers in New York and across the U.S., serving the source-identification function for them. By slavishly copying all these design elements, Defendants seek to appropriate Plaintiffs' original design and capitalize on their brand recognition in New York and across the U.S., fully intending to defraud the public at large.

79. Defendants' acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent the Defendants' products as those of Plaintiffs.

80. The Star Gel® trademark is famous and distinctive.

81. The Star Gel® trademark is a distinctive mark that has been in use for many years and plays a prominent role in Plaintiffs' marketing, advertising, and the popularity of their products across many different media.

82. The Star Gel® trademark has been through prominent, long, and continuous use in commerce, becoming, and continues to become, famous and distinctive.

83. The Star Gel® trademark is famous long before the Defendants began using unauthorized reproductions, counterfeits, copies, and colorable imitations on their unauthorized merchandise.

84. Long after the Star Gel® trademark became famous, the Defendants, without authorization from Plaintiffs, used unauthorized reproductions, counterfeits, copies, and colorable imitations of the Star Gel® trademark.

85. The Star Gel® trademark has gained widespread publicity and public recognition in New York and elsewhere.

86. The Defendants' sale of goods that use the Star Gel® trademark constitutes use in commerce of Plaintiffs' Star Gel® trademark.

87. Plaintiffs have not licensed or otherwise authorized the Defendants' use of their Star Gel® trademark.

88. Defendants' unauthorized use of the Star Gel® trademark causes consumers to locate and purchase the Defendants' products in the erroneous belief that the Defendants are associated with, sponsored by or affiliated with Plaintiffs, and/or that Plaintiffs are the source of those products.

89. The Defendants' use of Plaintiffs' Star Gel® trademark dilutes and/or is likely to dilute the distinctive quality of those marks and to lessen the capacity of such marks to identify and distinguish Plaintiffs' goods.

90. The Defendants' unlawful use of the Star Gel® trademark, in connection with inferior goods, is also likely to tarnish that trademark and cause blurring in the minds of consumers between Plaintiffs and the Defendants, thereby lessening the value of Plaintiffs' Star Gel® trademark, as unique identifiers of Plaintiffs' products.

91. By the acts described above, the Defendants have diluted, and are likely to dilute the distinctiveness of the Star Gel® trademark, and caused a likelihood of harm to Plaintiffs' business reputation.

92. As a direct result of Defendants' actions, Plaintiffs have suffered and continue to suffer damages consisting of, among other things, diminution in the value of and goodwill associated with the Star Gel® mark, and injury to Plaintiffs' business.

93. Defendants' actions described above and specifically, without limitation, Defendants' use of the Star Gel® trademark, and confusingly similar variations thereof, in commerce to advertise, market, and sell goods that use the Star Gel® trademark throughout the United States including New York, constitute unfair competition and false advertising.

94. The Defendants have palmed off their goods as Plaintiffs', improperly trading upon the Plaintiffs' goodwill and valuable rights including Star Gel® trademark.

95. Through their importation, advertisement, distribution, offer to sell and sale of unauthorized products bearing the Star Gel® trademark, Defendants have engaged in consumer-oriented conduct that has affected the public interest of the United States including New York and has resulted in injury to consumers throughout the United States including New York.

96. The Defendants' deceptive acts or practices, as described herein, are materially misleading. Such acts or practices have deceived or have a tendency to deceive a material segment of the public to whom the Defendants have directed their marketing activities, and Plaintiffs have been injured thereby.

97. The Defendants have committed the above-alleged acts willfully, and in conscious disregard of Plaintiffs' rights.

98. By the acts described above, the Defendants have engaged in unfair competition.

99. Customers, including consumers, are misled and deceived by Defendants' representations regarding Plaintiffs' Star Gel® trademark.

100. Defendants knew or should have known that their statements were false or likely to mislead.

101. Defendants have been unjustly enriched by illegally using and misappropriating Plaintiffs' intellectual property for Defendants' own financial gain.

102. As an actual and proximate result of Defendants' willful and intentional actions, Plaintiffs have suffered and continue to suffer damages including irreparable harm and damage to their business, reputation, and goodwill.

103. The actions of Defendants described above and specifically, without limitation, their knowledge, participation, and inducement of the unauthorized use of the Star Gel® trademark, and confusingly similar variations thereof, in commerce to advertise, market, and sell Star Gel® products throughout the United States and New York, constitute contributory trademark counterfeiting and infringement.

104. The actions of Defendants as alleged above were a real agreement or confederation with a common design to perpetrate one or more torts for an unlawful purpose or by an unlawful means.

105. Each and every Defendant is equally and vicariously liable to Plaintiffs for their damages proximately caused thereby.

106.     Plaintiffs have performed all conditions, covenants, and promises required to be performed by Plaintiffs in accordance with the terms of their written agreement with Meshi (Amended Complaint, Exhibit 2, "Original Agreement"; Amended Complaint, Exhibit 3, "Translated Agreement").

107.     As detailed above, Meshi has breached, and continues to breach, § 7 of its written agreement with Plaintiffs by selling merchandise bearing Plaintiffs' Star Gel® trademark to third parties, including Plaintiffs' New York customers.

108.     Meshi has breached, and continues to breach, its written agreement with Plaintiffs by unfairly interfering with Plaintiffs' right to receive the benefits of the agreement, by contracting with third parties, including Plaintiffs' New York customers, in a manner that capitalizes on Plaintiffs' well-known Star Gel® trademark and deprives Plaintiffs of profits from its commercial exploitation.

109.     As a direct and proximate result of Meshi's breaches of its written agreement with Plaintiffs as aforesaid, Plaintiffs have suffered, and will continue to suffer, enormous monetary damages.

110.     Meshi never submitted initial disclosures.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 17, 2022

Great Neck, New York

/s/ *Amir Rosenshine*
Amir Rosenshine

11

# EXHIBIT 2

**Allison Khaskelis**

| | |
|---|---|
| **From:** | Katya <katya@a-meshi.com> |
| **Sent:** | Tuesday, 20 September 2016 12:40 |
| **To:** | elinoach@yahoo.com |
| **Cc:** | 'Yermi' |
| **Subject:** | FW: ייצור ג'ל    Gel Manufacturing |
| **Attachments:** | PROFORMA 20160351 A TO Z IMPORT INC.pdf |

Hello Eyal,

Attached is a proforma invoice for your order.

Please check and confirm, so that we can move forward.

In addition I ask to complete the missing details of the company:

1. Your full name

2. The company VAT number

3. Is the address you provided also the address for shipping?

Regards,

Katya

שלום אייל

מצ"ב חשבון פרופורמה עבור הזמנתך.
נא לבדוק ולאשר, כדי שנוכל להתקדם.

כמו כן מבקשת להשלים את הפרטים החסרים של החברה:

1. השם המלא שלך
2. מספר VAT של החברה
3. האם הכתובת שנתת זאת גם הכתובת למשלוח?

בברכה
קטיה

---

**From:** Eli Noach [mailto:elinoach@yahoo.com]
**Sent:** Thursday, September 15, 2016 2:13 PM
**To:** Yermi
**Subject:** Re: ייצור ג'ל    Gel Manufacturing

A TO Z IMPORT INC
305 EAST 88 ST
BROOKLYN NY 11236
718-676-7788

On Thursday, September 15, 2016 3:53 AM, Yermi <yermi@a-meshi.com> wrote:

Hi Eyal,

It was nice talking to you over the phone and I hope we can do business together.

I ask that you send me a sample of the 1000 ml gel so that I can produce the product per your requirement, Ms. Edna ordered several versions of the product and it would be best that I produce according to sample. Attached is one of the versions.

I also ask for your company details so that I can issue you an order for your confirmation.

As I explained to you over the phone, you will be responsible for the issue regarding usage rights of the product name and designs.

אייל שלום

היה נחמד לשוחח אתך בטלפון ואני מקווה שנוכל להתקדם יחד בעסקים
אני מבקש שתשלח אליי דוגמא אחת של הג'ל 1000 סמ"ק על מנת לייצר את המוצר לפי דרישתך ,הגב' עדנה ייצרה בעבר מס' ורסיות של המוצר והכי נכון שאבצע לפי דוגמא מצ"ב אחת הוורסיות
כמו כן אבקש את פרטי החברה שלך על מנת להוציא הזמנה לאישורך
כפי שהסברתי בטלפון ,אתה תהיה אחראי לנושא זכויות השימוש בשם של המוצר ובעיצובים .

AMeshi_000006



מחיר המוצר יהיה $3 ליח' ,מינימום הזמנה 3600 יח' ,המחיר הוא EX WORK
בתודה מראש ירמי



**YERMI MIZRAHI**

Tel: 972-3- 9512017
Fax: 972-3- 9512018
YERMI@A-MESHI.COM
http://www.monplatin.com

The product price will be $3 per unit, minimum order 3,600 units, the price is EX WORK
Thanks in advance, Yermi

   

   

2

AMeshi_000007

# Ameshi cosmetic industries ltd

**To:** **A TO Z IMPORT INC**

305 EAST 88  ST
BROOKLYN NY 11236
USA

| | |
|---|---|
| Date: | 20/09/16 |
| Time: | 12:41 |
| L.T.: | 511947020 |

## Quotation   20160351

| # | Item code | Description | Quantity | Price | Total |
|---|-----------|-------------|----------|-------|-------|
| 1 | STAR 1 | JOJOBA STAR GEL 1000ml | 3,600 | 3.00 $ | 10,800.00 $ |

**Contact date**    **20/10/16**

| | |
|---|---|
| VAT exempt | 10,800.00 $ |

Sales person:    -ללא סוכן-

Payment:    Pre Pay

EX WORK
MADE IN ISRAEL

| | | |
|---|---|---|
| VAT | 0.00 % | |
| **Total** | | 10,800.00 $ |

---

## Allison Khaskelis

| | |
|---|---|
| **From:** | Eli Noach <elinoach@yahoo.com> |
| **Sent:** | Sunday, 4 December 2016 3:31 |
| **To:** | Katya |
| **Subject:** | Re: ORDER IS READY |
| **Attachments:** | gel.jpeg |
| | |
| **Follow Up Flag:** | המשך טיפול |
| **Flag Status:** | Flagged |

On Wednesday, November 30, 2016 8:20 AM, Katya <katya@a-meshi.com> wrote:

Hello Eyal,
Attached is a letter for your signature.
Please add ID number and last name and sign.
And send us scanned.
Regards
Katya



שלום אייל

מצ"ב מכתב לחתימתך.
בבקשה תוסיף מס' ת"ז ושם משפחה ותחתום.
ותשלח אלינו סרוק

בברכה
קטיה



A.MESHI COSMETIC INDUSTRIES

א. משי תעשיות קוסמטיקה

 **KATYA MIZRAHI**

Tel: 972-3- 9512017
Fax: 972-3- 9410839
katya@a-meshi.com
www.monplatin.com



   

1

AMeshi_000009

**From:** Katya [mailto:katya@a-meshi.com]
**Sent:** Wednesday, November 23, 2016 10:54 AM
**To:** 'elinoach@yahoo.com' <elinoach@yahoo.com>
**Cc:** 'Yermi' <yermi@a-meshi.com>
**Subject:** ORDER IS READY

שלום אייל

1.  ההזמנה שלך מוכנה.
מצ"ב חשבונית ופקינג ליסט  עבור ההזמנה.

2.  נא להעביר סכום של 1200$   בהקדם האפשרי.  (מצ"ב כרטסת של הנהלת חשבונות)
3.  ירמי מבקש שתעביר אליו התחייבות שאתה לוקח על עצמך אחריות עבור שם ועיצוב של הג'ל.

בברכה
קטיה







Hello Eyal,

 1. Your order is ready.
  Attached invoice and packing list for the order.

 2.  Please transfer $1,200 ASAP. (Attached is an accounting ledger)

 3.  Yermi is asking that you send him commitment that you take
 responsiblity for the name and design of the gel.

 Regards
 Katya

**KATYA MIZRAHI**

Tel: 972-3- 9512017
Fax: 972-3- 9410839
katya@a-meshi.com
www.monplatin.com

  

   

2

AMeshi_000010

30.10.2016 בע"ה

לכל מען דבעי

הנדון : ייצור ג'ל לשיער תחת השם : STAR GEL,

אני מר אייל  נ ר מ  בשם חברת INC IMPORT Z TO A מצהיר בזאת כי שם המוצר ועיצובו הינם באחריותי הבלעדית, היצרן חב' א.מ.ש.י תעשיות בע"מ איננו אחראי על זכויות השימוש בשם זה ועל זכויות השימוש בעיצוב המוצר

בכבוד רב :



To whom it may concern

Re: Production of hair gel under the name: STAR GEL

I, Mr. Eyal Noach, in the name of A TO Z IMPORT INC hereby declare that the product name and its design are my exclusive responsibility, the manufacturer A. Meshi Industries Ltd. is not responsible for the usage rights of this name and for the usage rights of the product design

Sincerely:

AMeshi_000011

## Allison Khaskelis

**From:** Katya <katya@a-meshi.com>
**Sent:** Sunday, 4 December 2016 9:12
**To:** 'Eli Noach'
**Subject:** RE: ORDER IS READY

Hello Eyal

Thank you.
Please arrange for transportation ASAP.

Regards
Katya



שלום אייל

תודה רבה.
בבקשה תארגן הובלה בהקדם.

בברכה
קטיה



**KATYA MIZRAHI**



 Tel: 972-3- 9512017
 Fax: 972-3- 9410839
 katya@a-meshi.com
 www.monplatin.com



   

---

**From:** Eli Noach [mailto:elinoach@yahoo.com]
**Sent:** Sunday, December 4, 2016 3:31 AM
**To:** Katya <katya@a-meshi.com>
**Subject:** Re: ORDER IS READY

On Wednesday, November 30, 2016 8:20 AM, Katya <katya@a-meshi.com> wrote:

1

AMeshi_000012

שלום אייל

מצ"ב מכתב לחתימתך.
בבקשה תוסיף מס' ת"ז ושם משפחה ותחתום.
ותשלח אלינו סרוק

בברכה
קטיה





✉ **KATYA MIZRAHI**

📱Tel: 972-3- 9512017
📠Fax: 972-3- 9410839
✉ katya@a-meshi.com
🌐 www.monplatin.com

   

<span style="color:red">Hello Eyal,
Attached is a letter for your signature.
Please add ID number and last name and sign.
And send us scanned.
Regards
Katya</span>



---

**From:** Katya [mailto:katya@a-meshi.com]
**Sent:** Wednesday, November 23, 2016 10:54 AM
**To:** 'elinoach@yahoo.com' <elinoach@yahoo.com>
**Cc:** 'Yermi' <yermi@a-meshi.com>
**Subject:** ORDER IS READY

שלום אייל

1. ההזמנה שלך מוכנה.
מצ"ב חשבונית ופקינג ליסט  עבור ההזמנה.

2. נא להעביר סכום של 1200$   בהקדם האפשרי.  (מצ"ב כרטסת של הנהלת חשבונות)
3. ירמי מבקש שתעביר אליו התחייבות שאתה לוקח על עצמך אחריות עבור שם ועיצוב של הג'ל.

בברכה
קטיה

<span style="color:red">Hello Eyal,
 1. Your order is ready.
 Attached invoice and packing list for the order.
2. Please transfer $1,200 ASAP. (Attached is an accounting ledger)
3. Yermi is asking that you send him commitment that you take responsiblity for the
 name and design of the gel.
Regards
Katya</span>

2

AMeshi_000013



 **KATYA MIZRAHI**

 Tel: 972-3- 9512017
Fax: 972-3- 9410839
katya@a-meshi.com
www.monplatin.com

   

   

3

AMeshi_000014

## Allison Khaskelis

| | |
|---|---|
| **From:** | Katya <katya@a-meshi.com> |
| **Sent:** | Tuesday, 13 December 2016 11:17 |
| **To:** | 'Tomer Hemi' |
| **Subject:** | RE: ל המכלה-A TO Z  ← Containerization for A TO Z |
| **Attachments:** | PACKING LIST FOR INVOICE 2016002481 A TO Z IMPORT INC.doc; INVOICE 2016002481 A TO Z IMPORT INC.pdf |

Hello Tomer
Attached is the paperwork. Sending second time.
Regards
Katya

שלום תומר

מצ"ב הניירת. שולחת פעם שנייה.

בברכה

קטיה



A.MESHI COSMETIC INDUSTRIES

א. משי תעשיות קוסמטיקה

**KATYA MIZRAHI**

 Tel: 972-3- 9512017
 Fax: 972-3- 9410839
 katya@a-meshi.com
 www.monplatin.com



   

---

**From:** Tomer Hemi [mailto:tomer@gal-r.co.il]
**Sent:** Tuesday, December 13, 2016 10:59 AM
**To:** katya@a-meshi.com
**Subject:** RE: ל המכלה-A TO Z  ← Containerization for A TO Z

Katya
Send me please the paperwork for the shipment

קטיה
שלחי לי בבקשה את ניירת היצוא של המשלוח

AMeshi_000015



**Thanks & Best Regards ,**

**Tomer Hemi**
**Ocean Export Manager**
**Gal-R International Forwarding Ltd**
**Tel : 972-8-9132771**
**Fax : 972-8-9257889**
**Mobile : 972-54-7619868**
**E-mail : tomer@gal-r.co.il**
**Web site : www.gal-r.co.il**



Hello
Following are the containerization details for the next container to Eyal A TO Z New York on Tuesday 12.13 at 08:00
Meshi – 6 pallets
Kliyat Zahi – 2 pallets
Victor Dalton – 12 pallets

Kliyat Zahi will bring the pallets to Dalton by the containerization date
The container will load first at Meshi, afterward Dalton and then enter Haifa port
Please confirm your participation

---

**From:** Tomer Hemi
**Sent:** Wednesday, December 7, 2016 4:04 PM
**To:** 'ZAHI_BARANSI@HOTMAIL.COM' <ZAHI_BARANSI@HOTMAIL.COM>; ''victor_t.nesher@hotmail.com' <'victor_t.nesher@hotmail.com>; 'katya@a-meshi.com' <katya@a-meshi.com>
**Cc:** 'Eli Noach' <elinoach@yahoo.com>
**Subject:** המכלה ל-A TO Z



Containerization for A TO Z

שלום
להלן פרטי המכלה מכולה הבאה לאייל A TO Z ניו יורק ביום שלישי 13.12 בשעה 08:00
משי- 6 משטחים
קליית זאהי-2 משטחים
ויקטור דלתון-12 משטחים

קליית זאהי יביא את המשטחים לדלתון עד מועד ההמכלה
המכולה תעמיס קודם אצל משי, לאחר מכן דלתון ותכנס לנמל חיפה

נא אשרו השתתפותכם

AMeshi_000016



**Thanks & Best Regards ,**


**Tomer Hemi**
**Ocean Export Manager**
**Gal-R International Forwarding Ltd**
**Tel : 972-8-9132771**
**Fax : 972-8-9257889**
**Mobile : 972-54-7619868**
**E-mail : tomer@gal-r.co.il**
**Web site : www.gal-r.co.il**



3

AMeshi_000017

**PACKING LIST FOR INVOICE:**  2016002481

# A TO Z IMPORT INC

**6** PALLETS
TOTAL WEIGHT:  **4262.0 kg**

| | | |
|---|---|---|
| **#1** | 120x84xH167 | W: 714.0 kg |
| **#2** | 120x84xH168 | W: 716.2 kg |
| **#3** | 120x84xH167 | W: 705.4 kg |
| **#4** | 120x84xH168 | W: 712.6 kg |
| **#5** | 120x84xH168 | W: 705.0 kg |
| **#6** | 120x84xH167 | W: 708.8 kg |

AMeshi_000018

# A.meshi cosmetic industries



**To: A TO Z IMPORT INC**

305 EAST 88  ST
BROOKLYN NY 11236
USA

| | |
|---|---|
| Date: | 23/11/16 |
| Time: | 10:57 |
| L.T.: | 511947020 |

## Invoice   2016002481                  Original

| # | Item code | Description | HS code | Quantity | Price | Total |
|---|-----------|-------------|---------|----------|-------|-------|
| 1 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 288 | $ 3.00 | $ 864.00 |
| 2 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 312 | $ 3.00 | $ 936.00 |
| 3 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 276 | $ 3.00 | $ 828.00 |
| 4 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 324 | $ 3.00 | $ 972.00 |
| 5 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 312 | $ 3.00 | $ 936.00 |
| 6 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 276 | $ 3.00 | $ 828.00 |
| 7 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 12 | $ 3.00 | $ 36.00 |
| 8 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 288 | $ 3.00 | $ 864.00 |
| 9 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 300 | $ 3.00 | $ 900.00 |
| 10 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 12 | $ 3.00 | $ 36.00 |
| 11 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 564 | $ 3.00 | $ 1,692.00 |
| 12 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 36 | $ 3.00 | $ 108.00 |
| 13 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 12 | $ 3.00 | $ 36.00 |
| 14 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 240 | $ 3.00 | $ 720.00 |
| 15 | STAR 1 | JOJOBA STAR GEL 1000ml | 33059000 | 348 | $ 3.00 | $ 1,044.00 |

**Pay by**          **23/11/16**

- חריגה מניכוי במקור עפ"י אישור מס

Sales person:        -ללא סוכן-

Payment:        Pre Pay

EX WORK
MADE IN ISRAEL

| | |
|---|---|
| VAT exempt | $ 10,800.00 |
| VAT        0.00 % | |
| **Total** | $ 10,800.00 |

---

Address:    Shimon Hburskai 8          Tel:    972-3-9512017          Fax:    972-3-9512018
Bat-Yam  5959249
ISRAEL

AMeshi_000019

## Allison Khaskelis

| | |
|---|---|
| **From:** | Eichut Labels <labels@netvision.net.il> |
| **Sent:** | Wednesday, 27 June 2018 9:19 |
| **To:** | Eli Noach; Nava |
| **Subject:** | Re: Star Gel |
| **Attachments:** | PastedGraphic-1.pdf; ___ ____ __ ____ 00092.htm |

AMeshi_000020

Good luck! ⟵    בהצלחה!

On 30 Oct 2016, at 12:54 PM, Eichut Labels <labels@netvision.net.il> wrote:

<PastedGraphic-5.pdf>

AMeshi_000021

file:///C:/Users/Allisonk/AppData/Local/Microsoft/Windows/INetCache/Content.Outlook/UBM1TIXF/_____ _____ ___ _____ 00092.htm
1/1

# St✩r Gel

AMeshi_000022