IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

<table>
<tr><td>

Oren Rosenshine

Amir Rosenshine

Plaintiffs,

   -against-

1) A. Meshi Cosmetics Industries Ltd.
2) A to Z Import Inc.
3) Eyal Noach

Defendants.

</td><td>

**Plaintiffs' Opposition to A. Meshi Cosmetics Industries Ltd.'s Motion for Summary Judgment**

Case No.
     18cv3572(LDH)(LB)


**Served on Defendants on January 19, 2023**

</td></tr>
</table>

**MEMORANDUM OF LAW IN OPPOSITION OF
A. MESHI COSMETICS INDUSTRIES LTD.'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Oren Rosenshine and Amir Rosenshine (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their opposition to Defendant A. Meshi Cosmetics Industries Ltd.'s ("Meshi") motion for summary judgment.  Plaintiffs rely on the following previously submitted documents for the purposes of this opposition: (a) Meshi's Local Civil Rule 56.1 Statement of Material Facts not Genuinely in Dispute ("Facts") (ECF No. 92-1) and all exhibits attached thereto (ECF Docs. 92-2 – 92-12), (b) Plaintiffs' Responses thereto ("Plaintiffs' Responses to Facts") (ECF No. 94), (c) Plaintiffs' Statement of Additional Facts ("Additional Facts") (ECF No. 94), the attendant exhibits and the October 17, 2022 Declaration of Oren Rosenshine ("Rosenshine Decl.") (ECF No. 94), and (d) Meshi's Responses thereto ("Meshi's Responses to Additional Facts") (ECF No. 95).

## RESPONSE TO MESHI'S STATEMENT OF FACTS

**I.     Plaintiffs' contract with Meshi was in full force and effect when Meshi first breached it in 2016**

Meshi's statement that its contract with Plaintiffs' predecessor, Global Manufacturing Import Export Inc. ("GMIE"), was not renewed in writing, is refuted as the contract granted GMIE an exclusive right to the Star Gel® trademark with no time limit, so there was no need to renew the contract.  Amended Complaint ("Am. Compl.") Exs. 2 & 3, ¶ 7.  Similarly, Meshi's statement that Plaintiffs' predecessors in interest failed to remit an outstanding payment of US $1,967.64 allegedly owed to Meshi for their 2012 Star Gel® orders is refuted as the August 30, 2022 Declaration of Allison Khaskelis ("Khaskelis Decl.") Ex. 4 shows an opening balance of $1,963.12 from the date of 01/01/2012, which proves that the source of this alleged open

balance was not Plaintiffs' and/or their predecessors' 2012 Star Gel® orders.  In fact, the opening balance originates from the failure of Meshi to credit GMIE's account for defective Star Gel® units that GMIE received from Meshi prior to 2012.  Plaintiffs' Responses to Facts, section 23.

Prior to 2012, Meshi agreed to credit GMIE for 804 defective units of Star Gel® that GMIE received from Meshi.  The defective units included some units that were not completely full, some units that were discolored, some units that exhibited mold, some units that had damaged jars, etc.  Meshi evidently failed to apply this credit to GMIE's account in its own records, as the credit does not appear anywhere on the general ledger that Meshi shared with Plaintiffs.  There is no outstanding balance whatsoever due to Meshi from Plaintiffs or any of their predecessors.  Additional Facts, sections 32-33.

II. **Rampant counterfeiting by Meshi, A to Z Import Inc. ("AZ"), and Mr. Eyal Noach ("Mr. Noach") (collectively, "Defendants") continues to this day, precluding any genuine Star Gel® sales, never mind the need to source additional stock**

Meshi's statements that it was approached by Mr. Noach in the fall of 2016, and that it was Mr. Noach who initiated the contact with Meshi's CEO, Mr. Yermi Mizrahi ("Mr. Mizrahi"), after searching for the manufacturer of Star Gel® to place an order, are disputed as it was in fact Meshi who approached Mr. Noach before the fall of 2016.  Toward the end of 2015, Mr. Noach told Plaintiffs' predecessor, International Grooming, Inc. ("IG"), that he "finally found the manufacturer of Star Gel®" and that AZ "will now be buying Star Gel®

directly from the manufacturer" at a much lower price than IG's pricing.  AZ then proceeded to solicit orders for Star Gel® and complementary products from numerous of IG's customers, offering them a lower price point for Star Gel® and diverting both Star Gel® sales and sales of complementary products from IG.  On September 15, 2016, Mr. Mizrahi wrote to Mr. Noach as follows: "It was nice talking to you over the phone and I hope we can do business together".  This further proves that there was contact between Mr. Mizrahi and Mr. Noach prior to the fall of 2016.  All the above proves decisively that Meshi has been actively deceiving IG's numerous U.S. customers, including AZ and Mr. Noach, by approaching them, offering them, and selling them counterfeit Star Gel® merchandise.  Plaintiffs' Responses to Facts, sections 27-28.

Meshi's statement that it had no commercial dealings with GMIE or its successors in interest for nearly four years is disputed as the agreement between Meshi and GMIE or its successors was still in force, granting GMIE exclusivity on the Star Gel® mark with no time limit.  Am. Compl. Exs. 2 & 3, ¶ 7.

Meshi's statement that AZ, GMIE's former customer, supplied the artwork for the counterfeit product's label that listed AZ's name and contact information, and that Meshi, as a manufacturer, was not involved in the creation or choice of that label and simply transmitted the artwork supplied by AZ to a third-party printing company it utilized for label-making, is disputed as, in fact, Meshi supplied Plaintiffs' Star Gel® artwork for producing the label of the counterfeit Star Gel® products to AZ.  Mr. Mizrahi wrote to Mr. Noach, "… attached is one of the versions".  Plaintiffs' Responses to Facts, section 35.

3

Meshi's statements that it made a one-time sale of 3,600 units of counterfeit Star Gel® to AZ in November 2016 for a price of $3/unit for a total revenue of $10,800; that it only ever sold Star Gel® to GMIE – between 2004 and 2012 – and to AZ during the alleged one-time sale in the fall of 2016; that it has not sold any Star Gel® to AZ or to anyone else following the alleged one-time sale to AZ in November 2016; that it has taken no steps to advertise, promote or attempt to sell any Star Gel anywhere in the United States following the alleged one-time sale to AZ in November 2016; and that it has not engaged in any conduct outlined in the Amended Complaint since November 2016, are all disputed as Meshi's counterfeiting was ongoing past November 2016, as demonstrated by live online listings of Meshi's counterfeit Star Gel® products. Furthermore, there is clear indication, based solely on the undisputed facts, that Meshi sold many more counterfeit Star Gel® units than the 3,600 counterfeit units it admitted to selling back in 2016, based on the widespread Star Gel® counterfeiting that persists in the marketplace until this present day, many years after Meshi's said 2016 sale, as well as on GMIE's past purchases of Star Gel® from Meshi, which amounted to approximately $10,000 worth of Star Gel® products on an annual basis between 2004 and 2012 (around 4,082 units per year at a price of $2.45 per unit), as declared by Meshi. As of 2022, six years have passed since the counterfeiting sale Meshi admitted to committing in 2016. At a rate of 4,082 units per year, it stands to reason that a quantity of at least 24,492 counterfeit units of Star Gel® were sold by Meshi to date, given that the market is currently saturated with counterfeit Star Gel® merchandise. The quantity of 3,600 that Meshi admits to have counterfeited seems unrealistically low by comparison. Meshi has had further communications with AZ after 2016,

including in 2018, demonstrating a continuing business relationship with AZ. Plaintiffs'
Responses to Facts, sections 34, 37-38, and 41.

Meshi's statement that Plaintiffs supplied no evidence that they utilized the Star Gel®
mark after registering it is disputed as it is not supported by the evidence cited by Meshi. The
evidence cited by Meshi only shows the invoices produced by Plaintiffs, even though there
were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs
could not locate the relevant invoices before the end of discovery. Furthermore, the evidence
Meshi cites only shows actual Star Gel® sales, so it cannot establish a lack of attempts to market
or sell Star Gel®, or a lack of utilization of the Star Gel® trademark by Plaintiffs or their
predecessors. Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors
between the years 2013 and 2015, beyond those documented in the produced invoices, as well
as sales of Star Gel® by Plaintiffs' predecessors after 2015. Furthermore, attempts to sell Star
Gel® never ceased and continue by IG to this day, which constitute an uninterrupted utilization
of the Star Gel® mark. Plaintiffs' Responses to Facts, sections 24-26, 32-33, 42, and 48-49.

**III.   Plaintiffs' evidence is sufficient to prove all their claims**

Plaintiffs have always been, and still are, eager to continue settlement discussions to
resolve the case in lieu of these proceedings. To that end, Plaintiffs put off litigation in favor
of mediation to try to settle the case. As Meshi itself admits to have requested evidence that
demonstrated the harm caused by Meshi to Plaintiffs, all the while refusing to recognize that
selling counterfeit Star Gel® to Plaintiffs' long-time customer AZ constitutes willful trademark
counterfeiting and breach of contract, it was indeed Meshi who chose to proceed with discovery

after ignoring Plaintiffs' document requests since December 2020.  It was clear to Plaintiffs that Meshi, who failed to produce its communications with AZ as part of the mediation proceedings even though it agreed to do so during the mediation session, was trying to waste Plaintiffs' allotted time for discovery, as it refused to agree to a stay of the discovery deadline while the mediation proceedings were ongoing.

Meshi's statement that it repeatedly chased Plaintiffs for responses to their Document Requests after the deadline is disputed as Plaintiffs requested more time to complete their responses, as Meshi's discovery requests were extremely wide-ranging.  Plaintiffs' Responses to Facts, section 14.  Indeed, Plaintiffs repeatedly chased Meshi's attorneys for responses to their Document Requests after the deadline for the same had passed.  Additional Facts, section 4.

Meshi's statement that pursuant to the invoices produced, Plaintiffs and/or their predecessors in interest sold a total of 2,131 units of Star Gel® between January 1, 2013 and October 19, 2015 for the maximum sale price of $10 is disputed as Meshi only cites the invoices produced by Plaintiffs, even though there were additional Star Gel® sales beyond those demonstrated by the invoices, for which Plaintiffs could not locate the relevant invoices before the end of discovery.  Furthermore, Meshi only accounts for sales of the Star Gel® products in calculating the total revenue earned by Plaintiffs for distributing Star Gel®, ignoring sales of complementary products generated by and/or dependent upon sales of Star Gel®, which the invoices demonstrate amount to many times more than $19,812.  Plaintiffs' Responses to Facts, sections 18-19.  Similarly, Meshi's statement that all sales were to grocery stores and

6

distributors serving a primarily Jewish and/or Israeli clientele is disputed as the invoices include sales to retailers not catering primarily to Jewish and/or Israeli clientele, including one large supermarket chain store that serves general clientele.  Plaintiffs' Responses to Facts, sections 16.

Contrary to Meshi's claim, Plaintiffs have no additional documents responsive to the Documents Requests because they could not locate any additional documents before the end of discovery, not because such documents never existed.  Indeed, there were additional sales of Star Gel® by Plaintiffs' predecessors between the years 2013 and 2015, beyond those documented in the produced invoices, as well as sales of Star Gel® by Plaintiffs' predecessors after 2015.  Plaintiffs could not locate the invoices for those sales before the end of discovery. Plaintiffs' Responses to Facts, section 21.

Contrary to Meshi's claim, Plaintiffs never confirmed to the Court that their predecessors in interest sold no Star Gel after 2015.  Instead, it is Meshi's distorted interpretation of the quoted phrase.  In fact, the phrase cited by Meshi refers to Star Gel sales invoices that Plaintiffs were able to locate by that time (at that time, none were located post 2015).  The phrase did not in any way refer to Plaintiffs' Star Gel® inventory.  Indeed, Plaintiffs' predecessor, IG, had more than 1,008 units of available stock for sale after 2015. Plaintiffs' Responses to Facts, section 20.

Contrary to Meshi's claim, the Court agreed with Plaintiffs regarding their motion to compel Meshi to produce its corporate structure, and effectively compelled Meshi to produce this information after recognizing that Meshi repeatedly refused to provide it to Plaintiffs, while

Plaintiffs were not compelled to produce anything to Meshi at all.  In the Court's own words: "For instance, even though the other family members were not allowed to be added to the lawsuit, I don't really know, Ms. Khaskelis, that that means you wouldn't produce the responses to their requests about the A. Meshi corporation and who is part of the corporation or what their chain of command or staffing is. And that was something that I thought, you know, again, even if they didn't ask for it in the most artful terms, they've asked many times for the ownership structure of A. Meshi including shareholders, their stakes in the company, directors, executive managers, the roles of Yermi Mizrahi, Shemtov Mizrahi, Nava Mizrahi in the company including positions, titles, responsibilities.".  Khaskelis Decl. Ex. 8, p. 10 lines 14-25 and p. 11 lines 1-2.

The Court continued to back Plaintiffs' request in the face of Meshi's attorney's repeated attempts to escape production of Meshi's corporate structure: "Again, you don't get to choose what you answer and what you don't answer. And even if the questions regarding the structure of A. Meshi Cosmetics Limited doesn't in any way resolve their underlying claim that plaintiff's trademark was violated, they are entitled to that information. So they may not be entitled to know what the family members actually do, but I do believe that they are entitled to information about the defendant's corporate structure because this is a lawsuit and if they were to prevail, they would want to have information about the corporate structure.".  Khaskelis Decl. Ex. 8, p. 12 lines 1-11.

All of the above demonstrates the difficulties Plaintiffs have endured throughout the case in dealing with Meshi's continued attempts to procrastinate and prolong the proceedings

against it, while continuing to capitalize on and reap profits from counterfeiting of Plaintiffs' Star Gel® trademark.

Contrary to Meshi's claim, Judge Bloom never expressed any frustration regarding discovery, but instead, naturally shared Plaintiffs' general desire to push the case forward. Since Plaintiffs have explained numerous times that their sales past 2015 were in steady decline due to AZ's beginning of order solicitations for Star Gel® and complementary products from numerous of IG's customers, offering them a lower price point for Star Gel® and diverting both Star Gel® sales and sales of complementary products from IG, as can also be seen from Plaintiffs' damages calculation table, Plaintiffs' sales invoices past 2015, if found, would not contribute materially to the existing evidentiary record consisting of 2013-2015 invoices, which already establishes that Plaintiffs never abandoned their Star Gel® trademark by the time of Meshi's first counterfeiting activities due to utilization of the mark in the preceding three years. Likewise with respect to any invoices from before 2013.  Hence, the discovery achieved its objectives and it was therefore time to proceed with the case, which is why Judge Bloom ordered the conclusion of discovery.

Meshi's claim that Plaintiffs' Responses to Facts, Additional Facts, and attendant exhibits are wholly devoid of factual support and corroboration is contradicted when it quotes Rule 56 that says witness statements are considered evidence that can be used in "countering the facts asserted by the defendant".  Needles to say, Plaintiffs' Responses to Facts and Additional Facts are backed by Rosenshine Decl. Exs. 1 & 2 and by some of Meshi's own submitted evidence as detailed in the submissions, among other solid pieces of evidence.

Unsurprisingly, Meshi is desperately attempting to gloss over such damning, hard evidence as its communications with AZ, sales invoice to AZ, photos of genuine vs. counterfeit Star Gel®, live online listings of counterfeit Star Gel® merchandise, Plaintiffs' own sales invoices to numerous customers across the U.S., sworn declarations from both Oren Rosenshine and Amir Rosenshine, etc.  Clearly, all of Plaintiffs' claims have rock-solid factual support.

1.  **There is ample evidence that conclusively proves Plaintiffs never abandoned their Star Gel® trademark when Meshi first counterfeited the mark in 2016, and have in fact been selling and/or attempting to sell Star Gel® to the present day**

Meshi's claim that Plaintiffs abandoned their Star Gel® trademark in October 2015 is contradicted by Plaintiffs' declarations (Khaskelis Decl. Ex. 10, pp. 7-16, Rosenshine Decl. Ex. 1), as well as by Plaintiffs' invoices cited by Meshi that show there were Star Gel® sales in the three years prior to October 2015 and in the three years prior to Meshi's counterfeiting in November 2016, thus defeating Meshi's abandonment claim.  Plaintiffs never declared that they abandoned their Star Gel® trademark after 2015 or at any other time, only that they could not locate invoices for sales that occurred after 2015 by the close of discovery.

Meshi's claim that Plaintiffs did not have valid Star Gel® inventory simply because they did not purchase from Meshi since 2012, is contradicted by Meshi's own admission that the Food and Drug Administration does not impose shelf lives and expiration dates on cosmetic products.  As such, it cannot serve as a basis for invalidating Plaintiffs' inventory, and there is no burden for Plaintiffs to prove that the inventory could have been sold.  Indeed, Meshi itself

shows that, as of November 24, 2022, it was able to locate online its own counterfeit Star Gel®

products that it claims to have sold in November 2016, over six years after its sale to AZ, thus

invalidating its claim that units older than 36 months are invalid for sale.  Similarly, Meshi's

claim about Plaintiffs' lack of email exchanges with a customer or a witness statement cannot

serve as proof that Plaintiffs abandoned the Star Gel® trademark by October 2015, as the

invoices submitted by Plaintiffs prove there were Star Gel® sales in the prior three years to

October 2015 and in the prior three years to Meshi's counterfeiting in November 2016, thus

defeating Meshi's abandonment claim.

## 2. There is evidence that Meshi sold additional Star Gel® beyond the 3,600 units it sold to AZ in the fall of 2016

Meshi's claim that its counterfeit Star Gel® exited the market is contradicted as Meshi

itself shows that it was able to locate counterfeit Star Gel® as of November 24, 2022.  As Meshi

claims that hair gel is invalid for sale after 36 months, the only conclusion that follows is that

the current counterfeit Star Gel® available for sale was sold by Meshi later than the fall of 2016.

Hence, Plaintiffs' assertion that Meshi sold additional counterfeit Star Gel® beyond the 3,600

units it admits to have sold to AZ in the fall of 2016, is backed by Meshi itself, as the counterfeit

Star Gel® on the market today was sold by Meshi less than three years from this date (January

2020 or later), as it would otherwise be invalid for sale according to Meshi.  Aside from this,

Plaintiffs can easily locate Meshi's counterfeit Star Gel® being sold both online and offline to

this day[1], defeating Meshi's claim that Meshi's counterfeit Star Gel® has exited the primary market.

Contrary to Meshi's claim that the online listings of counterfeit Star Gel® that Plaintiffs produced are probative of absolutely nothing, the listings not only establish the market presence of Meshi's counterfeit Star Gel®, but they also serve to establish that the counterfeit Star Gel® merchandise that Meshi put into the stream of commerce is being sold at a price of approximately $27 per unit, undercutting the genuine Star Gel® MSRP of $40 per unit. Khaskelis Decl. Ex. 10, pp. 23-32.

### 3. There is evidence that Plaintiffs suffered harm to their business from Meshi's sale of counterfeit Star Gel®

Meshi's statement that Plaintiffs have provided no support for the numbers used in their damages calculation table or proof for the validity of their compounding assumptions is disputed as Plaintiffs provided the basis for the calculations and outlined all assumptions. Plaintiffs' Responses to Facts, section 46.

In calculating the lost profits and damages to goodwill and reputation due to Meshi's counterfeiting, Plaintiffs used a 20% compound annual growth rate assumption in the table entitled "Computation of Lost Profits and Damages to Goodwill and Reputation" (Khaskelis Decl. Ex. 10). This assumption represents a fair estimate of future growth potential for IG's

---

[1] For example:
  https://www.ebay.com/itm/233922123669
  https://groceriesbyisrael.com/body-hygiene/hair-care/hair-gel/star-gel-jojoba-hair-gel.html
  https://www.sarahstentkoshermarket.com/aventura-florida/#!/hb/c/526-0/c/533-526/r/149216/he/kosher-health-beauty/kosher-hair//star-gel-jojoba-hair-gel

Star Gel®-anchored business model for 2016 and beyond, based on numerous factors, including, but not limited to, IG's business plans for 2016 and beyond, which included substantial increases in IG's marketing budget, expansion plans to target new customers, increased prices for the Star Gel® products, an increase in IG's complementary products offering, and other growth-oriented aspects, as well as the expected increased involvement of Plaintiffs in the management of the business for 2016 and beyond.  Additional Facts, section 29.

In calculating the lost profits and damages to goodwill and reputation due to Meshi's counterfeiting, Plaintiffs used a 25% annual compounding/discount rate assumption in the table entitled "Computation of Lost Profits and Damages to Goodwill and Reputation" (Khaskelis Decl. Ex. 10).  This assumption represents a fair estimate of the required return for investing in this type of business, reflecting an appropriate reward for the associated investment risk.  This required return is also commensurate with the required return implied by various buyout offers Plaintiffs and their predecessors received for the business from potential investors over the years.  Additional Facts, section 30.

Meshi itself asserts that Plaintiffs received $10 per unit based on the invoices Plaintiffs produced, and further admits to having counterfeited at least 3,600 units of Star Gel®.  Hence, by Meshi's own account, its counterfeiting activities have caused harm to Plaintiffs amounting to at least $36,000, contradicting its claim that there is no evidence Plaintiffs suffered any harm from its alleged one-time sale of counterfeit Star Gel® merchandise to AZ.

AZ has been selling the counterfeit Star Gel® for approximately $27 per unit, undercutting the genuine Star Gel® MSRP of $40 per unit.  At a price of $27 per unit, AZ's sales of just the 3,600 counterfeit units of Star Gel® that Meshi itself admitted to selling it, have yielded AZ a total of $97,200, for which Meshi is jointly and severally liable.  Additional Facts, sections 11-12.  Khaskelis Decl. Ex. 10, pp. 23-32.

Plaintiffs are entitled to recover both the actual damages they suffered, as well as all profits that Defendants have derived from using Plaintiffs' trademark.

Since Plaintiffs have demonstrated undeniable willfulness on the part of Meshi in counterfeiting Plaintiffs' trademark, Plaintiffs are entitled to treble the amount of actual damages they suffered, as well as treble Defendants' profits.

Meshi's preposterous claim that its counterfeit Star Gel® label is distinct from Plaintiffs' genuine Star Gel® label, because Meshi omits the ™ symbol from the counterfeit Star Gel® and lists AZ's name and contact information on the back of the label instead of Plaintiffs', just goes to show the level of arrogance that Plaintiffs are dealing with here. Obviously, removing the ™ or ® symbol from a trademark and listing one's own contact information on the back of the label instead of the brand owner's does not in any way, shape, or form prevent customer confusion.  It is beyond outrageous that Meshi effectively insists it can convince a jury that, for instance, Rolex is distinct from Rolex® or Rolex™, and that customer confusion is impossible here.  A cursory look at Am. Compl. Ex. 5 would, quite literally, instantly convince any person on the planet that customer confusion is 100% certain, as the counterfeit Star Gel® is undeniably virtually indistinguishable from the genuine product.

Am. Compl. Ex. 5 establishes that Meshi engages in painstaking counterfeiting of the Star Gel® product packaging design, which consists of a one-liter clear transparent plastic round jar with a diameter of 4.75 inches and a height of 5.25 inches, capped with a round, glossy white plastic dome-like screw cap overhanging the circumference of the jar, and printed with the distinctive Star Gel® logo in black faux-script lettering that features a capital letter "G" that incorporates a capital letter "J" in its design, which stands for "Jojoba" (the key ingredient), and replaces the letter "a" with a hollow five-point star.  Additionally, the slogan "The Top Jojoba Hair Gel" is printed below the Star Gel® logo in the same font, terminating at the bottom of the letter "G".  Below the logo and the slogan, the word "Jojoba" is printed in the center, and below it, the words "Hair Gel" are printed between two horizontal lines.  All these design elements consist of the distinctive Star Gel® product packaging design, which has acquired secondary meaning in the marketplace and is instantly recognizable to customers in New York and across the U.S., serving the source-identification function for them.  By slavishly copying all these design elements, Meshi seeks to appropriate Plaintiffs' original design and capitalize on their brand recognition in New York and across the U.S., fully intending to defraud the public at large.  Additional Facts, section 85.

Similarly, Meshi's claim that its counterfeit Star Gel® version is missing the phrase "Another fine product from the Top Star™ Line" on the very bottom of the jar, has no merit whatsoever, as this trivial omission does not detract at all from the effectiveness of Meshi's counterfeiting efforts, which evidently produced a very convincing replica.

Of course, the proof is in the pudding: Meshi's own admission of the successful sales of counterfeit Star Gel® to Plaintiffs' long-time customer AZ proves, beyond any and all doubt, not only potential, but actual customer confusion.

Meshi's claim that Plaintiffs provided no evidence to establish links between Plaintiffs' inability to sell Star Gel® and other products' sales is contradicted by Plaintiffs' invoices, which show numerous items being sold together with Star Gel®.  Furthermore, Rosenshine Decl. Ex. 1 fully explains the connection between Star Gel® and other product sales, as customers who were already purchasing Star Gel® from IG and its predecessors often found it more convenient to source these other products from IG and its predecessors as well, rather than purchase them from other suppliers, even if IG and its predecessors were not always the most cost-effective option for every single one of these other items.  Additional Facts, sections 15-19.

Meshi's claim that Plaintiffs failed to identify customers who stopped ordering from them or their predecessors in interest because of Meshi's counterfeit Star Gel® sales, is contradicted by Meshi's own claim that Plaintiffs' or their predecessors have not sold any genuine Star Gel® since October 2015, right before AZ started soliciting orders for Meshi's counterfeit Star Gel®, as well as complementary products, from numerous of IG's customers, offering them a lower price point for Star Gel® and diverting both Star Gel® sales and sales of complementary products from IG.

<u>**RESPONSE TO MESHI'S LEGAL ARGUMENT**</u>

<u>**Plaintiffs satisfied the necessary elements of all their claims**</u>

1.  **First claim (federal trademark counterfeiting in violation of 15 U.S.C. § 1114)**

Meshi's *Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F.Supp.2d 455, 471 (E.D.N.Y. 2008) case citation regarding relief under Section 32 of the Lanham Act refers to an instance where a party (in this case distributor Krasnyi Oktyabr) that does not own trademark rights has no standing to bring a claim under Section 32 of the Lanham Act.  In our case, Plaintiffs are the undisputed trademark owners that hold the rights to the Star Gel® trademark so they have standing to bring a claim under Section 32 of the Lanham Act.  Meshi's claim that it only sold 3,600 units of counterfeit Star Gel® on November 2016 before the trademark was registered in May 2017 does not relieve Meshi from liability under Section 32 of the Lanham Act as the counterfeiting has been ongoing past the registration date until today, including in 2018.  Not only that, Meshi never took any action to stop the counterfeiting operation after placing the counterfeit Star Gel® products in the stream of commerce in November 2016, even after cease-and-desist letters were sent or the trademark was registered, and is therefore liable for federal trademark counterfeiting under Section 32 of the Lanham Act.  Meshi was already familiar with the Star Gel® trademark before the counterfeiting sale on November 2016, by virtue of being the supplier of Star Gel® to Plaintiffs' predecessors and the written agreement between them. In addition, Mr. Mizrahi refers to Plaintiffs' predecessor, Edna, in an email to Mr. Noach of AZ from September 15, 2016 (before the November 2016 sale to AZ) mentioning Edna's use of the Star Gel® trademark, proving once again that he was aware of Plaintiffs' or their predecessor's rights to the Star Gel® trademark.  As Meshi's counterfeit Star Gel® is identical to Plaintiffs' genuine Star Gel®, being the same type of product and sold to Plaintiffs' customers, it leaves no doubt that Meshi's sale of counterfeit Star Gel® is intentional, regardless of the trademark

17

registration date.  Additional Facts, sections 1, 7, 10, 26, and 38; Plaintiffs' Responses to Facts, sections 10, 34-39, and 41.

At any rate, Meshi's claim that it only sold 3,600 units of counterfeit Star Gel® on November 2016 is contradicted by Meshi itself, as the counterfeit Star Gel® on the market today was sold by Meshi less than three years from this date (January 2020 or later), as it would otherwise be invalid for sale according to Meshi.  Hence, this proves Meshi sold counterfeit Star Gel® after the trademark was registered in May 2017.

Even in a hypothetical case where Meshi only ever sold counterfeit Star Gel® to AZ in 2016 before the trademark registration date in 2017, Meshi would not be able to escape liability under Section 32 of the Lanham Act by claiming that it only produced and sold counterfeit Star Gel® to AZ before the trademark's registration date, and it was AZ that sold this same counterfeit merchandise after the registration date, hence liability under Section 32 falls only on AZ.  Meshi, AZ, and Mr. Noach are all jointly and severally liable for any damages sustained by Plaintiffs as a result of Defendants' collective counterfeiting operation.  Since Meshi is the one who knowingly put the counterfeit Star Gel® merchandise into the stream of commerce, and consequently, knowingly took the risk that the trademark could be registered at any time as it has been circulating on the market for the preceding three years so it was obviously eligible for registration and not abandoned, it would still be liable for any sales of its counterfeit merchandise by other parties that occur after the registration date.  Any sales of Meshi's counterfeit merchandise subsequent to the trademark registration date by other parties would still be traced back to Meshi as the ultimate source of all counterfeit Star Gel® in existence and

the ultimate cause of any Section 32 violations.  Plaintiffs would still be entitled to collect their full Section 32 damages from any actor in the counterfeiting chain, including from the original manufacturer (in this case, Meshi), even if the original manufacturer put the counterfeit merchandise into the stream of commerce before the trademark registration date.

**2. Second claim (federal trademark infringement in violation of 15 U.S.C. § 1114, 1125(a) and New York State common law)**

Meshi's claim that Plaintiffs admitted that they did not market or attempt to sell Star Gel® by 2016 is evidently false, as utilization of the Star Gel® mark never ceased.  At any rate, Meshi's claim that Plaintiffs abandoned the Star Gel® trademark in November 2016 is refuted as Meshi itself acknowledges that Plaintiffs used the Star Gel® trademark in the three years prior to November 2016, referring to the invoices Plaintiffs produced, thereby defeating Meshi's abandonment claim.  Meshi's sale of counterfeit Star Gel®, which is identical to Plaintiffs' Star Gel® trademark on identical goods (hair gel), to Plaintiffs' customer AZ, proves both potential and actual customer confusion, making Meshi liable under both 15 U.S.C. § 1114, 1125(a) and New York State common law.  Additional Facts, sections 10 and 15-31; Plaintiffs' Responses to Facts, sections 15, 20, 22, 24-26, 32, 49, and 51-54.

**3. Third claim (false designation of origin in violation of 15 U.S.C. § 1125(a))**

Meshi's claim that the counterfeit Star Gel® it sells to AZ is not likely to cause customer confusion because "A to Z's label clearly bore its own name and address and made no reference to Plaintiffs/their predecessors in interest" is a desperate attempt to whitewash its criminal counterfeiting conduct.  By listing AZ's name on the back of the counterfeit label, Meshi only

rubs salt into Plaintiffs' wounds, as potential customers have consequently come to believe that AZ is either the new owner of Star Gel®, or an authorized distributor or licensee of the genuine product, thereby raising AZ's profile in the marketplace and affording the counterfeiter undue credibility, diverting exposure and further sales from Plaintiffs to AZ, including sales of complementary products.

Needless to say, listing AZ on the back of the counterfeit label does not prevent customer confusion as Meshi still uses the Star Gel® name, which is identical to Plaintiffs' genuine Star Gel®, on identical goods (hair gel), and sells them to Plaintiffs' customer AZ, proving both potential and actual customer confusion.

Meshi's claim that Plaintiffs had no Star Gel® to sell since October 2015 is refuted as the evidence Meshi provides refers to sales, not inventory or attempts to sell/market.  Plaintiffs had ample inventory to sell in 2015 and beyond, and their utilization of the Star Gel® mark never ceased.  Hence, Meshi's sale of counterfeit Star Gel® diverted Star Gel® sales from Plaintiffs as well as additional complementary sales, representing the harm sustained by Plaintiffs.  As Meshi itself admits to having sold 3,600 counterfeit Star Gel® units to Plaintiffs' customer AZ, it is evident that enormous harm was inflicted upon Plaintiffs by Meshi's diversion of sales.  Additional Facts, sections 10 and 15-31; Plaintiffs' Responses to Facts, sections 20, 22, 24-26, 32, and 51-54.

**4.  Fourth claim (federal trademark dilution in violation of 15 U.S.C. § 1125(c) and N.Y. Gen. Bus. Law § 360-l)**

Plaintiffs have proved that the Star Gel® trademark is famous as it has been widely sold across the U.S. since 2004, unlike SBBI's trademark in *Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, 14 CIV. 7170 CM, 2014 WL 5585339, *7 (S.D.N.Y. Oct. 30, 2014), where SBBI's customers were not even alleged to be nationwide.  Accordingly, Plaintiffs met the necessary requirements for federal trademark dilution under 15 U.S.C. § 1125(c).  As Meshi's counterfeit Star Gel® is circulating on the market by Meshi's own admission and diverting sales from Plaintiffs, while Meshi has not taken any steps to correct or mitigate any damages resulting from its counterfeiting activities, the dilution claim under N.Y. Gen. Bus. Law § 360-l is not moot, and injunctive relief is required in order to enjoin Meshi from further counterfeiting and compel it to disseminate corrective advertisements in a form approved by the Court to acknowledge Meshi's violations of the law hereunder, and ameliorate the false and deceptive impressions produced by such violations.  Additional Facts, sections 10, 15-31, 52, 55, 85, and 87-92; Plaintiffs' Responses to Facts, sections 16, 18, 37-38, 41, and 52-56.

## 5.  Fifth claim (federal unfair competition and false advertising under 15 U.S.C. § 1125 (a) and New York common law)

Meshi's claim that its counterfeit Star Gel® label only listed AZ's name and contact information is contradicted by the photos of Meshi's counterfeit Star Gel®, which clearly show Plaintiffs' Star Gel® name being used.

Meshi's claim of selling 3,600 units of counterfeit Star Gel® to Plaintiffs' customer AZ (offering identical product in the same distribution channel) satisfies both the zone of interest test and demonstrates economic injury to Plaintiffs of diverted Star Gel® sales to Meshi as well

as additional complementary lost sales as previously discussed.  Accordingly, both the zone of interest and proximate cause tests have been satisfied to establish statutory standing under Section 43.  Additional Facts, sections 10 and 15-31; Plaintiffs' Responses to Facts, sections 51-56.

Meshi's claim that Plaintiffs failed to demonstrate any bad faith on the part of Meshi, whose alleged only sale to AZ took place long after Plaintiffs' predecessors in interest stopped sourcing Star Gel® from Meshi or selling/attempting to sell it, is further contradicted by Meshi's email exchange with AZ regarding selling counterfeit Star Gel®, where Meshi refers to Plaintiffs' trademark rights in the email exchange with AZ, proving Meshi is fully aware of Plaintiff's Star Gel® trademark rights when selling counterfeit Star Gel® to Plaintiffs' customer AZ.

## 6.  Sixth claim (contributory trademark infringement)

Meshi's denial that there was a viable trademark to infringe upon in November 2016 is contradicted by Rosenshine Decl. Ex. 1 as well as the invoices produced by Plaintiffs, which show Star Gel® sales in the prior three years to Meshi's counterfeit Star Gel® sale in November 2016, thus defeating Meshi's abandonment claim.  Meshi's sale of counterfeit Star Gel® to AZ constitutes inducement as Meshi was familiar with Plaintiffs' Star Gel® trademark by the time it sold counterfeit Star Gel® to AZ.  Furthermore, by virtue of Meshi's familiarity with Plaintiffs' Star Gel® trademark, Meshi knew that selling counterfeit Star Gel® to Plaintiffs' customer AZ amounts to trademark infringement.  Mr. Mizrahi refers to Plaintiffs' predecessor in an email to Mr. Noach of AZ from September 15, 2016 (before the November 2016 sale to

AZ) mentioning Edna's use of the Star Gel® trademark, proving once again that he was aware of Plaintiffs' rights to the Star Gel® trademark.  Additional Facts, sections 6-10, 14, 20, and 37-38; Plaintiffs' Responses to Facts, sections 27-30, 35, 37-38, and 41.

Meshi's statement that it was Mr. Noach of AZ that located Meshi and placed the order is disputed as Meshi approached Mr. Noach before the fall of 2016.  Toward the end of 2015, Mr. Noach told IG that he "finally found the manufacturer of Star Gel®" and that AZ "will now be buying Star Gel® directly from the manufacturer" at a much lower price than IG's pricing. AZ then proceeded to solicit orders for Star Gel® and complementary products from numerous of IG's customers, offering them a lower price point for Star Gel® and diverting both Star Gel® sales and sales of complementary products from IG.  On September 15, 2016, Mr. Mizrahi wrote to Mr. Noach as follows: "It was nice talking to you over the phone and I hope we can do business together".  This further proves that there was contact between Mr. Mizrahi and Mr. Noach prior to the fall of 2016.  All the above proves that Meshi has been actively deceiving IG's numerous U.S. customers, including AZ and Mr. Noach, by approaching them, offering them, and selling them counterfeit Star Gel® merchandise.  Plaintiffs' Responses to Facts, sections 27-28.

Lastly, Meshi's claim that the record belies any argument that Meshi continued to supply any Star Gel® to anyone in the United States after the one-time sale in the fall of 2016 is contradicted by Meshi itself, as the counterfeit Star Gel® on the market today was sold by Meshi less than three years from this date (January 2020 or later), as it would otherwise be invalid for sale according to Meshi.

### 7.   Ninth claim (tortious conspiracy)

Meshi's sale of counterfeit Star Gel® to AZ demonstrates a tort by diverting Star Gel® sales from Plaintiffs to Meshi.  Meshi's email exchange with AZ regarding selling counterfeit Star Gel® demonstrates an agreement between Meshi and AZ to sell counterfeit Star Gel® (Meshi refers to Plaintiffs' trademark rights in the email exchange with AZ), and the subsequent sale demonstrates an overt act in furtherance of the agreement (Meshi's actual sale of Plaintiffs' Star Gel® to AZ) and the parties' intentional participation in executing the counterfeiting operation.  Furthermore, Meshi's admission of selling 3,600 units of counterfeit Star Gel® to Plaintiffs' customer AZ demonstrates harm to Plaintiffs of diverted Star Gel® sales as well as additional complementary sales.  Additional Facts, sections 6-10, 14, 20, and 15-31; Plaintiffs' Responses to Facts, sections 51-56.

### 8.   Tenth claim (breach of contract)

Meshi's claim that there is no contractual relationship between Plaintiffs or their predecessors in interest and Meshi because no order was placed after 2012, is contradicted by the contract as there is no such condition in the contract.  Furthermore, Meshi's claim that paragraph 7 of the contract does not constitute a conferral of any obligation on Meshi, is contradicted by the contract itself, which Meshi acknowledged and signed.  Furthermore, Meshi's citation of *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.* as an example that agreements in perpetuity are disfavored refers to "contracts that omit any point of time or any condition which would terminate the promisor's liability".  In fact, the case recognizes that "there are contracts in which the promisor's obligation has been expressly fixed to last forever".

As the contract with Meshi expressly says that "buyer has exclusivity on this name [Star Gel] without time limit", "there is no ambiguity or uncertainty in this language" as the case explains to infer that Meshi's obligation is perpetual.

Plaintiffs' and/or their predecessors' alleged unpaid balance of $1,967.64 for Star Gel® purchased in 2012 does not constitute a breach of contract by Plaintiffs and/or their predecessors, as the contract only refers to a single payment in the sum of $4,900 from 2004 (section 1 to the contract), while Meshi's claim of an alleged unpaid balance refers to a purchase from 2012, which is not part of the contract.  Thus, Plaintiffs and their predecessors performed all their parts to the contract with Meshi, satisfying the condition of due performance by Plaintiffs necessary for their breach of contract claim against Meshi.  Furthermore, Meshi's admission of selling 3,600 units of counterfeit Star Gel® to Plaintiffs' customer AZ demonstrates the harm done to Plaintiffs, consisting of diverted Star Gel® sales from Plaintiffs to Meshi as well as additional lost complementary sales, proving damages were sustained by Plaintiffs as a direct result of Meshi's breach.  Additional Facts, sections 15-33; Plaintiffs' Responses to Facts, sections 9, 12, and 23.

## CONCLUSION

For all the reasons set forth above, Meshi's motion for summary judgment lacks any basis and should be denied in its entirety, including costs awarded for Plaintiffs for drafting this Opposition.

Dated: January 19, 2023

Great Neck, New York

Respectfully submitted,

/s/ Oren Rosenshine        /s/ Amir Rosenshine

Oren Rosenshine            Amir Rosenshine

26